ESTADO LIBRE ASOCIADO DE PUERTO RICO, representado por el Hon. GOBERNADOR DE PUERTO RICO y la AUTORIDAD SOBRE HOGARES DE PUERTO RICO, demandantes y apelados, *v.* MARTÍN AGUAYO, demandado y apelante.

Número 11601.

*Reasignado:* 24 de marzo de 1958. *Resuelto:* 27 de junio de 1958.

*Jorge V. Toledo,* abogado del apelante; *Hon. Secretario de Justicia J. B. Fernández Badillo (José Trías Monge, ex-Secretario de Justicia,* en el alegato) y *Aurelio Torres Braschi,* abogados del Estado Libre Asociado; *R. B. Pérez Mercado,* abogado de la Autoridad sobre Hogares de Puerto Rico.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

El 10 de febrero de 1955 el Estado Libre Asociado de Puerto Rico y la Autoridad sobre Hogares de Puerto Rico, como demandantes, y Martín Aguayo como demandado, sometieron al Tribunal Superior, Sala de Expropiaciones, una Estipulación sobre expropiación forzosa amparándose en las disposiciones de la Regla 7(d) de las Reglas de Enjuiciamiento Civil.

Luego de las afirmaciones usuales sobre la personalidad jurídica y los poderes legales de los demandantes, las partes estipularon los siguientes hechos:

El 10 de junio de 1953 la Autoridad adoptó la Resolución núm. 763 declarando "zona de arrabal" y "decadente" al sitio conocido como "La Playa" en el Municipio de Arecibo, habiéndose comprometido los gobiernos estatal y federal y el Municipio de Arecibo a anticipar ayuda económica para la reurbanización de dicha área. Se describen las condiciones imperantes en el arrabal *La Playa* que justifican las actuaciones de la Autoridad.

En dicho lugar ubica una propiedad del señor Aguayo que no puede clasificarse como "de arrabal" o "decadente", pero que los demandantes alegan es esencial eliminarla para el adecuado desarrollo del proyecto de reurbanización.

Los litigantes están de acuerdo en cuanto al valor de la mencionada propiedad ($2,850) pero no en cuanto a realizar una compraventa voluntaria y la demandante Autoridad sobre Hogares ha adoptado, por consiguiente, una resolución autorizando se expropie dicho inmueble.

Existe entre las partes "una fundamental controversia con motivo de criterios opuestos" en cuanto a la constitucionalidad de las leyes que autorizan el programa de reurbanización, sosteniendo el demandado que tales leyes "son inconstitucionales y sin valor alguno, y todas las resoluciones, contratos, determinaciones, cosas y hechos de la demandante a tenor de dichas leyes, son nulos y sin valor ni efecto legal . . ."

En síntesis, el demandado alega que son inconstitucionales las disposiciones de ley que autorizan: (*a*) la expropiación de propiedad privada para usos privados; (*b*) la expropiación de terrenos vacantes y de estructuras en buen estado; (*c*) el uso de fondos estatales, municipales y de la Autoridad, la emisión de bonos y los préstamos de dinero para los propósitos ya indicados; (*d*) la disposición de terrenos por un precio menor que el costo de adquisición; (*e*) la indebida delegación de poderes legislativos a la Autoridad; y (*f*) la autorización otorgada a la Autoridad para poseer terrenos en exceso de 500 acres. Sostiene, además, que tales leyes son

nulas porque comprenden más de un asunto sin expresarlo en sus títulos y por no haber sido adoptadas nuevamente por la Asamblea Legislativa luego de aprobarse la Constitución de Puerto Rico.

Acompañaba a este documento una declaración jurada firmada por César Cordero Dávila, en su carácter de Director Ejecutivo de la Autoridad, y por Martín Aguayo, en la cual hacían "constar que los hechos estipulados en este caso presentan una controversia real y efectiva" y que "esta acción se radica de buena fe con el propósito de resolver la referida controversia." Tal declaración fue jurada y suscrita en Arecibo[1] el día primero de febrero de 1955 ante el Notario Efraín Ramírez Ramírez.

Junto a estos documentos se presentaron al tribunal copias de las resoluciones pertinentes al caso aprobadas por la Autoridad, la Junta de Planificación y el Municipio de Arecibo y se depositó un cheque por la suma de $2,850 "a disposición del demandado."

El 10 de marzo de 1955 el Tribunal Superior, sin haber celebrado vistas y sin haber solicitado ni recibido informes escritos de los litigantes, expidió una resolución titulada "Exposición del Caso, Conclusiones de Hecho, de Derecho y Sentencia". En esta resolución el tribunal reprodujo los hechos aceptados en la Estipulación y, además, tomó conocimiento judicial "de las condiciones de vida y sociales prevalecientes en muchas comunidades de Puerto Rico" particularmente en lo que se refiere a las necesidades de vivienda. En sus conclusiones de derecho determinó que los "hechos estipulados presentan una real y efectiva controversia en cuanto a los derechos y prerrogativas legales de la demandante, justificando una resolución judicial de los mismos." Examinó luego las alegaciones del demandado y desestimó todas las objeciones constitucionales interpuestas por éste. Final-

---

[1] Aunque la declaración dice "San Juan", en la vista ante este Tribunal quedó establecido que se firmó en Arecibo.

mente, el tribunal dictó sentencia declarando con lugar la demanda y la expropiación de la finca del demandado.

El siguiente día 11 de marzo el demandado interpuso recurso de apelación para ante este Tribunal. El día 4 de abril presentó una moción ante el Tribunal Superior solicitando se le entregara la suma depositada por la Autoridad y comprometiéndose a "reintegrar la suma envuelta en este caso al serle devuelta la posesión de su propiedad." El tribunal señaló una vista para discutir dicha moción, pero luego ordenó la entrega de los fondos al demandado al estar conforme los demandantes con lo solicitado. Consta de los autos un escrito firmado por Martín Aguayo en San Juan el día 29 de abril de 1955, donde acepta haber recibido de Luis M. Cabañas, Secretario del tribunal, un cheque por la suma de $2,850.

El demandado-apelante sometió su alegato ante este Tribunal el 22 de mayo de 1955 y los demandantes lo hicieron el 21 de julio de ese año. Las partes presentaron una moción el 8 de octubre de 1957 que en su parte pertinente dice como sigue:

"1.—A los fines de evitar las consecuencias de una impresión errónea que puedan haber creado ciertas manifestaciones que se han hecho en la Prensa en relación con el presente caso, las partes desean consignar que tienen sumo interés en que éste siga su curso normal y sea objeto de una adjudicación por parte de esta Superioridad.

"2.—Las partes aprovechan la oportunidad para consignar, además, que consideran una determinación de este Hon. Tribunal Supremo en el presente caso, a base de los planteamientos que se han hecho, de una extraordinaria importancia como cuestión de interés público, por lo que la esperan con suma ansiedad."

Considerando esa moción y las manifestaciones del abogado Efraín Ramírez Ramírez publicadas en el periódico El Mundo (edición de 12 de septiembre de 1957) en las que "como abogado del señor Martín Aguayo" afirmaba que "hace tiempo el señor Aguayo vendió, sin necesidad de expropiación su propiedad a la Autoridad" y que el caso "se ha llevado y

se sigue llevando con fines distintos a los que se alegan y habiendo mediado ya una compraventa de la propiedad, el caso resulta académico", este Tribunal, el día 2 de enero de 1958, ordenó la celebración de una vista, "con el propósito de determinar: si este pleito ha sido presentado de buena fe, si existe entre las partes una controversia real y efectiva y si procede que este Tribunal considere y resuelva las cuestiones constitucionales planteadas en el recurso." Fueron citados para dicha vista los señores Martín Aguayo, César Cordero Dávila y Luis M. Cabañas, los abogados Jorge V. Toledo, Aurelio Torres Braschi, Rafael B. Pérez Mercado, Octavio Malavé Torres, Pablo Defendini, Efraín Ramírez Ramírez y Rafael Rodríguez Ema, y se comunicó la Resolución del Tribunal al Hon. Secretario de Justicia. La vista se llevó a cabo durante los días 8 y 9 de enero estando presentes todas las personas mencionadas. Todas las personas citadas prestaron testimonio y tanto ellas como la representación del Hon. Secretario de Justicia tuvieron completa oportunidad para repreguntar a los testigos y ofrecer cualquier prueba pertinente.

El 17 de marzo de 1958 enviamos a los litigantes copia de una certificación del Registrador del Registro de la Propiedad de Arecibo acreditativa de que la finca objeto de este litigio nunca había sido inscrita en dicho Registro a nombre de Martín Aguayo, y solicitamos se nos informara en cuanto a "los efectos, si algunos, de la situación registral sobre el presente recurso." El 24 de marzo de 1958 quedaron archivados en autos los informes correspondientes.

I

Conviene aclaremos en primer término cuál es la autoridad de los tribunales para determinar si son o no colusorios, académicos o ficticios los casos que ante ellos se plantean. Esta autoridad nace del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen

interés real en obtener un remedio que haya de afectar sus relaciones jurídicas. Este requisito es un derivado del origen antropológico de los organismos judiciales. (²) Es de carácter jurisdiccional y tiene rango constitucional en diversos países. (³) Complemento indispensable de esa limitación tiene que ser la facultad inherente y el deber de cada tribunal de investigar, en las ocasiones necesarias, las circunstancias en las cuales se originan y desarrollan los litigios. Esa facultad ha sido reconocida desde hace largo tiempo en el sistema anglosajón de justicia(⁴) y númerosísimas sentencias le sirven de apoyo. (⁵)

Tal vez nadie ha descrito ese deber con mayor claridad que el Tribunal Supremo de Nevada en *Haley* v. *Eureka County Bank et al.*, 26 Pac. 64, 65 (1891).

"Cuando se somete una causa ante un tribunal, el juez tiene el deber de proteger escrupulosamente sus procedimientos para que no sean utilizados colusoriamente por los litigantes, y no puede permitir que se dicte sentencia sin estar completamente seguro de que existe una causa de acción autorizada por la ley. Si se traen hechos ante el tribunal que produzcan cualquier sospecha de que existe colusión entre las partes, no importa el medio o la manera en que esos hechos se pongan en conocimiento del tribunal, es el deber del juez instituir inmediatamente una investigación para determinar la certeza o falsedad de los cargos."

(²) Jerome Frank, *Courts on Trial* (1949), págs. 5–9.

(³) Véase Edwin Borchard, *Declaratory Judgments* (1941), pág. 33, donde se considera la experiencia de los Estados Unidos, Australia, Canadá, Africa del Sur, Nueva Zelandia, Argentina, Brazil, Colombia, Perú y Venezuela.

(⁴) En *Coxe* v. *Philips*, 95 Eng. Rep. R. 152 (1736) citado en Diamond, *Federal Jurisdiction to Decide Moot Cases*, 94 U. of Pa. L. Rev. 125 (1946) se resolvió que una tentativa para someter un caso ficticio constituía desacato a la corte. Se suspendieron los procedimientos y se ordenó la encarcelación de los ofensores.

(⁵) Gran parte de la jurisprudencia de los Estados Unidos se encuentra recogida en Diamond, *op. cit.*, pág. 126; Borchard, *op. cit.*, págs. 81–86; Robertson y Kirkham, *Jurisdiction of the Supreme Court of the United States* (1951) págs. 493–536.

En *Lord* v. *Veazie*, 8 How. 250 (1850) dijo el Juez Presidente Taney (a la pág. 254):

"La función de los tribunales de justicia es la de dictaminar sobre los derechos personales y de propiedad cuando las personas interesadas no pueden ponerse de acuerdo sobre ellos, y hacer esto luego de oir a las dos partes. Y cualquier tentativa, por medio de una disputa ficticia, para obtener la opinión de un tribunal sobre una cuestión de derecho que una parte desea conocer para su propio interés y sus propósitos particulares, cuando no existe una controversia verdadera y substancial entre los que comparecen como partes opuestas en el pleito, constituye un abuso que los tribunales de justicia siempre han censurado y han considerado como un desacato punible."

Carece de importancia cómo un tribunal adquiere conocimiento sobre hechos indicativos de que un pleito es ficticio, colusorio o académico ni quién sea la persona que provea la información. Puede hacerse formalmente por moción de uno de los litigantes o de un tercero—*United States* v. *Johnson*, 319 U. S. 302, 303 (1943); *American Wood-Paper* v. *Heft*, 19 L. Ed. 378, 75 U. S. 333, 334 (1869); *Cleveland* v. *Chamberlain*, 66 U. S. 419, 426 (1861); *Lord* v. *Veazie*, supra, pág. 255; *Ward* v. *Alsup*, 46 S. W. 573, 574 (Tenn. 1898); *Haley* v. *Eureka County Bank*, supra, pág. 64—o por medios informales—*Walling* v. *Wholesale Food and Supply Co.*, 141 F.2d 331, 334 (C. C. A. 8, 1944); ([6]) *East Tenn., Va. & Ga. Railroad Co.* v. *Southern Telegraph Co.*, 125 U. S. 695, 696 (1888); ([7]) *Williams* v. *Simons*, 2 L. Ed.2d 87, 91 (1958. ([8]) El Tribunal Supremo Federal ha llegado al extremo de decidir que un caso es académico sin indicar en su opinión la fuente que le proveyó la prueba para tal determinación. *Alton* v.

---

([6]) Carta enviada por un abogado al Secretario del Tribunal.

([7]) Carta enviada por un abogado al Tribunal.

([8]) "La Corte de Distrito le comunicó a esta Corte su orden denegatoria de 29 de octubre, y le expresó su criterio de que habiéndose convertido en académicas las cuestiones de este pleito, esta Corte debería revocar su orden de mostrar causa."

*Alton,* 347 U. S. 610 (1954); ([9]) *Amalgamated Assoc'n. of Street Employees* v. *Wisconsin Employment Board,* 340 U. S. 416, 418 (1951). ([10]) Asimismo, el tribunal puede obtener la información necesaria de los autos—*C.I.O.* v. *McAdory,* 325 U. S. 472, 475 (1945); *Coffman* v. *Breeze Corporations,* 323 U. S. 316, 324 (1945); *Chicago and Grand Trunk Ry. Co.* v. *Wellman,* 143 U. S. 339, 342 (1892); *Gardner* v. *Goodyear Dental Vulcanite Co.,* 131 U. S. (Appendix) CIII (1873); *Bartmeyer* v. *Iowa,* 18 Wall. 129, 134 (1873); *Atherton Mills* v. *Johnston,* 259 U. S. 13, 15 (1922); *Waiahua Agricultural Co.* v. *Maneja,* 178 F.2d 603, 606 (C.C.A. 9, 1949); *Moore* v. *Caldwell County et al.,* 176 S. E. 580 (N. C. 1934); *Navarro* v. *Calderón,* 61 D.P.R. 339, 342 (1945); *Echandía* v. *Saldaña,* 61 D.P.R. 799, 804 (1945)—o de las admisiones de los abogados en los informes orales—*Cover* v. *Schwartz,* 133 F.2d 541, 546 (C.C.A. 2, 1942); *Washington Market Co.* v. *District of Columbia,* 137 U. S. 62, 63 (1890); *Buck's Stove and Range Company* v. *A.F.L.,* 219 U. S. 581 (1911); *South Spring Gold Co.* v. *Amador,* 145 U. S. 300, 301, (1892); *St. Pierre* v. *United States,* 319 U. S. 41, 42 (1943). También puede hacerse uso del conocimiento judicial para determinar si la controversia es ya académica—*United States* v. *Hamburg-America Co.,* 239 U. S. 466, 475 (1915); *Mills* v. *Green,* 159 U. S. 651, 657 (1895); *Richardson* v. *McChesney,* 218 U. S. 487, 492 (1910); *Jones* v. *Montague,* 194 U. S. 147, 153 (1904). Los hechos pueden darse a conocer al tribunal en cualquier momento antes de resolverse el recurso—*Little* v. *Bowers,* 134 U. S. 547, 558 (1889); *United States* v. *Johnson,* supra, pág. 305—y el tiempo que el caso haya estado pendiente no afecta las facultades del tribunal. En *Little* v. *Bowers,* el Tribunal

---

([9]) "Luego de la vista y de haber quedado sometido el caso a esta Corte, fuimos autorizadamente informados de que el 28 de abril de 1954 y a solicitud del apelado se había dictado en Connecticut una sentencia final de divorcio."

([10]) "Hemos sido informados que este laudo fue sustituído por un acuerdo . . . ."

Supremo federal sostuvo que era su deber desestimar un pleito académico aun cuando el mismo había estado tres años ante el Tribunal y las causas de desestimación eran conocidas por los litigantes desde hacía dos años.

El tribunal puede ordenar la desestimación inmediata del recurso si comprueba que no existe una controversia real entre los litigantes—*United States* v. *Johnson*, supra, pág. 305; *C.I.O.* v. *McAdory*, supra, pág. 478; *Amalgamated Ass'n. of Street Employees* v. *W.E.R.B.*, supra, pág. 418; *Cleveland* v. *Chamberlain*, supra, pág. 426; *Lord* v. *Veazie*, supra, pág. 256; *Williams* v. *Simons*, supra, pág. 87; *Title Guaranty & Trust Co.* v. *Mortgage Commission*, 3 N.E.2d 433, 434 (N. Y. 1936)—o puede ordenarles que aporten prueba adicional sobre la cuestión. Esa prueba puede producirse mediante declaraciones juradas, informes escritos o en una vista—*American Wood-Paper Co.* v. *Heft*, supra, 19 L. Ed. 379; *Macklin* v. *Kaiser Co.*, 69 F. Supp. 137, 138 (D. C. Oregon, 1946); *East Tenn., Va. & Ga. Railroad Co.* v. *Southern Telegraph Co.*, supra, pág. 696; *Bell & Howell Co.* v. *Bliss*, 262 Fed. 131, 133 (C.C.A. 7, 1931). Si luego de la debida investigación se comprueba que no existe una controversia genuina es deber del tribunal, dependiendo de las circunstancias, desestimar el recurso desde su incepción o desestimar la apelación, sin considerar los méritos de los planteamientos.[11]

Aunque en el presente litigio las partes no han objetado formalmente el procedimiento instituído por este Tribunal, la demandante Autoridad sobre Hogares lo ha calificado en su alegato como "un tanto anómalo". Acepta que "hubo unas manifestaciones en la Prensa en relación con el caso que este Hon. Tribunal no podía pasar por alto y demandaban acción inmediata," pero sostiene que tales manifestaciones las hizo una persona extraña al litigio y que se debió citar únicamente

---

[11] Véase la discusión y autoridades citadas en la opinión del Juez Jerome Frank en *Cover* v. *Schwartz*, supra, a la pág. 546 y en Robertson y Kirkham, *ob cit.*, pág. 498.

a esa persona para que las sustanciara o las rectificara, sin tomarse "acción fiscalizadora en el caso."

Obviamente, la demandante no tiene razón. En primer lugar, en su moción de 8 de octubre de 1957 ante este Tribunal, los litigantes aludieron expresamente a "ciertas manifestaciones que se han hecho en la Prensa en relación con el presente caso" y por consiguiente, formalmente llamaron la atención de este Tribunal hacia tales manifestaciones. En segundo término e independientemente de lo anterior, dichas manifestaciones las hizo el Lic. Efraín Ramírez Ramírez, un funcionario de este Tribunal, y a título de "abogado de Martín Aguayo" y contienen imputaciones graves en cuanto a la manera en que se originó y se continuó este caso, las cuales afectan la conducta de varios abogados y funcionarios públicos y la autoridad y el prestigio de los tribunales, y requerían, por lo tanto, una completa dilucidación. Finalmente, no entendemos cómo la demandante o sus abogados puedan tener queja alguna contra un procedimiento en el cual se les ofreció ante este Tribunal toda clase de oportunidades para explicar su conducta y las circunstancias de este caso y cómo hubiesen preferido un procedimiento en el cual únicamente se examinara al autor de las imputaciones y se hubiera privado a los litigantes de la oportunidad de interrogarlo y de presentar prueba adicional.

## II

La circunstancia de haber actuado como tribunal de primera instancia en las vistas del 8 y 9 de enero y la trascendencia de esas vistas requieren que hagamos una detallada relación de los hechos que consideramos probados. Son los siguientes:

Desde 1949 la Autoridad sobre Hogares de Puerto Rico estaba empeñada en encontrar un caso en que pudiera plantearse la constitucionalidad de las leyes de renovación urbana, las cuales la propia Autoridad tiene la obligación de administrar y defender. Aunque los funcionarios y abogados de la

564

Autoridad no tenían (ni tienen) duda alguna sobre la validez de tales disposiciones legislativas, (¹²) las insistentes peticiones de los funcionarios encargados de la administración del programa federal de viviendas y de los abogados de las firmas que habrían de comprar los bonos emitidos por la Autoridad, los inducía a buscar continuamente una oportunidad para someter tales leyes al escrutinio judicial. Más tarde esas peticiones se convirtieron en amenazas de suspender la ayuda federal, (¹³) apoyándose en la idea de que no se podía continuar poniendo en riesgo grandes cantidades de dinero de los Estados Unidos desconociéndose si las leyes estatales eran o no válidas. Todos los abogados de la Autoridad, y específicamente los Lics. Rafael B. Pérez Mercado y Rafael Rodríguez Ema, tenían conocimiento de este grave problema y estaban sobre aviso para encontrar a alguna persona interesada en impugnar las mencionadas leyes ante los tribunales. Ésta, sin embargo, no resultó tarea fácil. Como señaló el señor Cordero Dávila en su franco y sincero testimonio: "Entonces de Washington, nos pidieron a nosotros que tratáramos de conseguir en alguna forma establecer en Puerto Rico si era o no constitucional la ley. Naturalmente para desgracia nuestra—o para dificultad nuestra—podemos decir— en Puerto Rico no existen o no surgen como en los Estados Unidos fácilmente, entidades o personas que quieran ocasionar dificultades al programa y traten de conseguir se declare anticonstitucional la ley." (T. E. pág. 76.) Y añadió más adelante: ". . . en Puerto Rico no ha habido un interés marcado en nadie de obstaculizar el programa . . . nunca tuvimos ningún caso en que alguien quisiera llevar con energía, con

---

(¹²) El señor Cordero Dávila expresó sobre este asunto que "yo creo que en realidad no debe haber ninguna duda." (T. E. pág. 134.) El Lic. Rafael B. Pérez Mercado, abogado de la Autoridad, redactó un memorándum "tratando de convencer a estos abogados [de los bonistas] que las leyes eran constitucionales . . . ." (T. E. pág. 355.)

(¹³) No obstante esas amenazas, la ayuda continuó. El señor Cordero afirmó que la Autoridad había recibido de los organismos federales alrededor de $200,000,000 de los cuales aproximadamente la mitad habían sido para el programa de renovación urbana. (T. E. págs. 95 y 96.)

entusiasmo y con un gran interés un caso como éste . . ." (T. E. pág. 99.)

A fines de 1954 el Lic. Rodríguez Ema, en el desempeño de sus funciones como abogado de la Autoridad, [14] sostuvo una conversación con el señor Martín Aguayo, relacionada con la propiedad que éste poseía en la barriada La Playa de Arecibo. Declaró Rodríguez Ema que tanto Aguayo como otros propietarios protestaban de que la Autoridad se adueñara de sus propiedades y que el primero mostraba "inconformidad con, no solamente el precio que le pagaban, sino con el hecho de que su casa no se estaba cayendo a pedazos como la mayoría sino que era una casa relativamente buena . . . ." (T. E. pág. 438.) Ante esa situación Rodríguez Ema le recomendó a Aguayo que si no estaba conforme "podía permitir que la Autoridad iniciara un pleito de expropiación y defendiera su punto de vista en esta Corte." (Id.) Para inducir a Aguayo a aceptar este plan, el abogado de la Autoridad le ofreció sus servicios profesionales gratuitamente, incluyendo la apelación ante este Tribunal Supremo, y que el litigio no le costaría nada. Hizo este ofrecimiento "como una cooperación a resolver una situación que tenía la Autoridad" y no lo hubiese hecho si no hubiese existido ese problema. (T. E. pág. 441.)

Otra razón esencial al ofrecimiento surge del siguiente pasaje:

"P. ¿Se debió su oferta al hecho de usted creer que esa era la única manera en que el señor Aguayo habría de llevar este pleito, que no le costara a él un solo centavo y meramente se limitara a firmar un papel?"

"R. Bueno, yo sé que si yo le pido dinero para hacerlo no lo hubiese hecho. Así es que usted está en lo correcto." (T. E. pág. 498.)

---

[14] Rodríguez Ema declaró que desde 1953 tiene un contrato con la Autoridad bajo el Programa de Renovación Urbana para "adquirir de los propietarios la venta voluntaria de su propiedad a favor de la Autoridad." (T. E. pág. 437.)

En esa conversación el abogado de la Autoridad le sugirió a Aguayo algunas de las objeciones constitucionales que podrían plantearse y se abstuvo de expresarle su opinión sobre los méritos del caso, aunque entendía que las probabilidades de éxito eran adversas a Aguayo. Tampoco hay prueba de que el Lic. Rodríguez Ema hiciera esfuerzo alguno por lograr que Aguayo se aviniera a vender la propiedad voluntariamente a pesar de que "si las personas tenían reservas, pues, finalmente después de tratar de disuadirlos a muchos de cuanto medio uno pudiera, pues se permitía que se llevaran a Expropiaciones, o sea, como cuestión de política pública no recurrir en uno de esos proyectos en masa a Expropiación si había gente que voluntariamente estaba en disposición de vender." (T. E. pág. 439.) El 9 de septiembre de 1954, Martín Aguayo firmó una carta, preparada por Rodríguez Ema, "con una secretaria de la Autoridad en Arecibo", que transcrita literalmente dice como sigue:

Arecibo, P. R.
9 de septiembre de 1954

Lcdo. Rafael Rodríguez Ema
San Juan, P. R.

Señor:

De conformidad a nuestra conversación de hoy le encomiendo mi representación legal en el caso de expropiación que la Autoridad Sobre Hogares de P. R. ha radicado en mi contra para adquirir mi propiedad sita en el Bloque H-47 de 'La Playa', Arecibo. Le autorizo a aceptar como satisfactoria la tasación de $2,850 que se me ha ofrecido. Puede Ud. levantar en mi favor cualquier cuestión de derecho que estime conveniente.

Atentamente,

(Fdo.) MARTÍN AGUAYO

Obsérvese que ya en esta fecha Aguayo ha aceptado el precio que se le ha ofrecido por la propiedad, que habla de "un pleito que la Autoridad ha radicado en mi contra . . ." (aunque el pleito comenzó cinco meses más tarde) y que encomienda su representación legal al abogado de la Autoridad

y le autoriza a "levantar cualquier cuestión de derecho que estime conveniente."

Martín Aguayo confirma en su testimonio sustancialmente lo declarado por el Lic. Rodríguez Ema. Sostiene, además, que firmó la carta de autorización sin leerla y sin consultar a ningún otro abogado y que se le leyó la declaración jurada que acompañó a la estipulación pero no esta última.[15] En numerosas ocasiones durante su testimonio, tanto a preguntas de los jueces de este Tribunal como de varios de los abogados presentes, Martín Aguayo enfáticamente afirmó que su interés en el caso se refería exclusivamente al precio que habría de pagársele y que había cesado tal interés una vez recibió el dinero. Es cierto que en una ocasión dijo que no hubiese dado su casa "ni por 5,000 pesos" (T. E. pág. 56) pero esa manifestación la hizo luego de repetidas afirmaciones de que su único interés era en el precio,[16] las cuales anteriormente había expresado[17] y que confirmó más adelante.

---

[15] El Lic. Efraín Ramírez Ramírez, ante quien se juró la declaración, expresó que ésta se leyó en forma general, "un extracto." (T. E. pág. 269.)

[16] "P. ¿A usted le estuvo bien que la Autoridad le quitara su casa para otros fines?

"R. Bueno, a mi no me estuvo bien.

"P. ¿Usted no estaba contento, no estaba conforme con que le quitaran su casa?

"R. Sí, porque me daban menos de lo que valía.

"P. Pero aparte del precio que le estaban pagando, ¿usted estaba conforme o estaba contento, satisfecho con que le quitaran su casa?

"R. No, no estaba contento.

"P. ¿Usted quería mantener su casa, no es eso?

"R. Yo quería que me dieran más porque la casa valía más. Y no estaba conforme con el precio.

"P. Pero ¿usted tenía interés en venderla y que le quitaran la casa, en salir de la casa o tenía interés en retenerla?

"R. No, yo por mí no la habría dado ni en 5,000 pesos.

"P. ¿De manera que a usted no le gustó que le quitaran su casa?

"R. Seguro que no. No me gustó pero como había que . . . (T. E. págs. 55–56.)

[17] "P. Señor Aguayo, ¿porqué dice usted que no tiene interés?

"R. Bueno, porque a mí me pagaron la casa. Me pagaron la casa y yo no tengo interés en más nada.

"P. ¿Quién le pagó la casa?

"R. El Gobierno.

"P. Ahora, dígame una cosa, y esta es la última pregunta. Digo, yo le voy a hacer esta pregunta con toda franqueza, ¿usted se siente obligado a decir que no tiene interés en este caso porque está aquí declarando o es una cosa libre y espontánea suya?

"R. Bueno, como me dieron los chavos ya yo no tengo interés en nada.

"P. ¿Esa es su actitud desde antes de recibir la citación?

"R. Bueno, desde que me dieron los chavos. Después que me dieron los chavos yo no tengo ningún interés en esto. (T. E. pág. 68.)

Otros testimonios confirman la falta de interés de Aguayo. El señor Cordero Dávila explica de la siguiente manera la información que él recibió de los abogados de la Autoridad en cuanto a la actitud del señor Aguayo:

"Yo quise aclarar, lo quise decir al principio, que no había habido un caso donde surgiera . . . el deseo y la iniciativa de alguien para impugnar la ley. Eso no había surgido. Ahora, surgió sí, el comentario, la impresión que se nos trajo de que

"P. ¿Usted recibió el dinero?

"R. Recibí el dinero.

"P. ¿Y usted estuvo conforme con el precio?

"R. Yo acepté el precio y dije que estaba bien. (T. E. pág. 14.)

. . . . . . . .

"P. ¿Usted habló de un pleito con la Autoridad, usted tenía un pleito con la Autoridad?

"R. Bueno, me dijeron que firmara eso y yo lo firmé.

"P. ¿Pero usted tiene interés en seguir con ese pleito?

"R. Yo no tengo interés ninguno.

"P. ¿Usted tiene interés en que prosiga esta apelación?

"R. No.

"P. ¿Usted no quiere seguir?

"R. Ya yo cogí los chavos y no quiero saber más de eso. (T. E. págs. 32–33.)

. . . . . . . .

"P. Digo, usted aparte del precio ¿tenía alguna otra controversia con la Autoridad?

"R. Ninguna. (T. E. pág. 38.)

. . . . . . . .

"P. Ahora, en este momento yo le hago la pregunta, ¿usted está conforme con que la Autoridad se quede con la propiedad y usted se quede con el dinero y usted no tiene interés en seguir con este pleito?

"R. Eso mismo es lo que yo quiero no tener pleitos ninguno.

"P. ¿Usted no quiere proseguir ese pleito?

"R. No, no. (T. E. pág. 42.)

Aguayo estaba interesado en llevar el caso. Eso fue. No fue una cosa que pudiéramos decir que Aguayo lo iniciara él por su propia cuenta sino que nosotros supimos que él había comentado en cuanto a la facultad de la Autoridad de adquirir esa propiedad, y en cuanto a que se sentía él reacio a que se le arrebatara esa propiedad. Esa fue la impresión que yo formé del caso. Ahora, no fue que él de su propia cuenta él llevara el caso, lo iniciara y entonces, nosotros nos encontráramos ya con el pleito, no. Nosotros supimos que ese era el deseo de él y nosotros entonces, vimos el cielo abierto. Nosotros entonces vimos, al haber alguien que estuviera con el deseo de llevar ese pleito que no estuviera conforme del todo con que se le arrebatara o se le quitara la propiedad, entonces, al tener ese caso nosotros entonces, lo vimos con buenos ojos porque resolvía un problema que teníamos y que tenemos todavía." (T. E. págs. 80–81.)

El Lic. Efraín Ramírez Ramírez, vecino y amigo de Martín Aguayo, en varias ocasiones conversó con éste sobre sus relaciones con la Autoridad.

"P. Dígame, ¿cuando esta situación surgió, Aguayo no se consultó con usted con relación al posible derecho de la Autoridad para quitarle su propiedad, para expropiarle su propiedad?

"R. En unas ocasiones habló así, a veces nos encontramos como vecinos y habló sobre eso, pero, claro, él siempre ha mantenido su actitud esa reacia.

"P. ¿A . . . ?

"R. A no querer litigar, él no desea litigar, o sea, la actitud de él siempre fue no litigar." (T. E. pág. 273.)

Específicamente, y a raíz de unas manifestaciones en la prensa en que se mencionaba al señor Aguayo y a su pleito con la Autoridad, Ramírez habló con Aguayo.

"P. ¿Pero en cuanto a esta propiedad y la Autoridad de Hogares, qué le dijo el Sr. Aguayo en esta ocasión?

"R. Más o menos lo mismo que él declaró esta mañana aquí.

"P. ¿Usted tendría la bondad de repetirlo?

"R. Que ya él había recibido el dinero, que él había firmado unos papeles, que para él ya era todo terminado.

"P. ¿Le expresó si tenía o no interés en este asunto todavía?

"R. Yo realmente en cuanto al interés noté que no tenía ninguno pero no quise ahondar en eso." (T. E. pág. 225.)

Ramírez afirmó en una parte de su testimonio que Aguayo le había dicho que se había realizado una compraventa entre él y la Autoridad.

"P. ¿Cuál fue la base del compañero para afirmar que había habido una compraventa de la propiedad?

"R. El propio Sr. Aguayo.

"P. ¿En que sentido fue la información del Sr. Aguayo?

"R. El me manifestó a mi: 'Yo he recibido dinero, el importe, tengo el dinero, yo he vendido esa propiedad y no . . .' " (T. E. pág. 216.)

Más adelante, Ramírez aclaró que Aguayo no había utilizado la palabra "compraventa" pero que la explicación que le dio era la de que había "vendido" su casa a la Autoridad.

"P. ¿Y él utilizó la palabra venta o compraventa con relación a la propiedad?

"R. No, la palabra compraventa específicamente la usé yo porque la explicación que él me dio era de que él había vendido porque lo había hecho con otras propiedades también." (T. E. pág. 226.)

" . . . . . . . .

"P. Compañero, ¿pero hubo compraventa, hubo compraventa como cuestión de realidad?

"R. La información que tenía del Sr. Aguayo es en el sentido de que él había obtenido su dinero y que había firmado unos documentos.

"P. ¿Pero él no le habló de que había habido compraventa, según usted dijo ayer?

"R. El me habló de una venta, él me habló de una venta.

"P. En el día de ayer usted dijo que él no había usado la palabra compraventa.

"R. No, no la había usado Sr. Juez." (T. E. págs. 289–290.)

Es ésta, desde luego, la única explicación lógica que puede existir de las manifestaciones autorizadas por el Lic. Ramírez y publicadas en el periódico El Mundo, edición de 12 de septiembre, 1957 en las que afirmaba que "hace tiempo el señor Aguayo vendió, sin necesidad de expropiación, su propiedad a la Autoridad."

Cumpliendo con lo ofrecido por su abogado, la Autoridad brindó a Martín Aguayo todas las facilidades necesarias para que el caso pudiese plantearse y continuarse en los tribunales sin ocasionarle el mínimo gasto o la menor molestia al demandado. Se le proveyeron servicios profesionales y secretariales libres de costo, y se sufragaron todos los gastos del litigio (sellos, transcripción, materiales de oficina). El señor Aguayo no tuvo que comparecer a corte ni aun a recibir el dinero depositado por la Autoridad, [18] ni se le ocupó para consultarle sobre los distintos pasos o planteamientos del caso. Con la posible excepción de una entrevista de diez minutos con el Lic. Jorge Víctor Toledo (a quien el Lic. Rodríguez Ema seleccionó para que se encargara de la defensa de Aguayo), entrevista que Aguayo rotundamente niega tuviera lugar, y de una entrevista con los Lics. Rodríguez Ema y Ramírez, a la cual nos referiremos más adelante, Martín Aguayo estuvo totalmente desconectado del caso. Finalmente, la Autoridad permitió que Aguayo retirara del Tribunal Superior la suma de $2,850, aunque no había solicitado ni obtenido una declaración de adquisición y entrega de la propiedad del demandado y, por consiguiente, no había adquirido título sobre la misma. [19]

El 8 de octubre de 1957 se sometió a este Tribunal una moción suscrita por los licenciados Pablo Defendini y Jorge V. Toledo, en representación respectivamente de la Autoridad sobre Hogares y Martín Aguayo. Este último también dio su firma a la moción bajo la frase "enterado y conforme". Es este el documento transcrito anteriormente, en el cual los litigantes, haciendo alusión a unas manifestaciones hechas en la Prensa, comunican a este Tribunal su interés en que se resuelva el caso.

---

[18] Aguayo declaró que el cheque se le entregó en Arecibo, aunque existe un recibo firmado por él donde acepta haber recibido el cheque en San Juan de manos del Secretario del Tribunal Superior, Sr. Cabañas. Éste no pudo recordar si le había entregado o no ese cheque a Aguayo.

[19] 32 L.P.R.A. sec. 2907.

Si el 12 de septiembre de 1957 el Lic. Ramírez Ramírez, luego de conversar con el Sr. Aguayo, había manifestado que éste último había vendido su propiedad a la Autoridad y que el caso resultaba académico ¿cómo es posible que unas semanas más tarde el señor Aguayo firmase esta moción? Dos razones explican este acto. Primero, obsérvese que el conflicto entre las manifestaciones de Ramírez y la moción es más aparente que real. La moción se limita a consignar el interés de las partes en que el caso "siga su curso normal y sea objeto de adjudicación" y señala "su extraordinaria importancia como cuestión de interés público", pero no obstante hacer alusión "a ciertas manifestaciones que se han hecho en la Prensa," y que, obviamente, no podían ser otras que las del Lic. Ramírez, no contradice directamente las graves afirmaciones de Ramírez relativas a la compraventa de la propiedad de Aguayo y a que el caso "se ha llevado y se sigue llevando con fines distintos a los que se alegan." En segundo término, estamos completamente convencidos de que Martín Aguayo firmó esta moción únicamente porque su amigo y vecino, el Lic. Ramírez, le instó a hacerlo, apelando a su patriotismo y civismo, recalcando la importancia pública del asunto y solicitando de Aguayo que lo "complaciera". [20] En numerosas ocasiones durante su testimonio Ramírez explicó que esas

---

[20] El Estado Libre Asociado implícitamente acepta que el único posible interés que puede quedarle al apelante Martín Aguayo es el que nace de su "sentido cívico." Nos pide en su alegato no demos a Aguayo por desistido en este recurso, no obstante sus repetidas afirmaciones de no querer continuar con el mismo, a menos que él presente una solicitud formal de desistimiento luego de que le hayamos ofrecido una oportunidad "para que medite, en su hogar y frente a las realidades últimas que aquí están en juego, si él debe ceder a los imperativos de su sentido cívico y no debe liquidar con su actuación un programa de reconstrucción social de tan vastos alcances." El señor Aguayo tuvo ante este Tribunal todas las oportunidades de expresar su criterio libremente y en todas ellas afirmó no tener interés en el caso y no querer continuar con el mismo. Acceder a lo solicitado significaría descartar por inútil el método fundamental utilizado en nuestro sistema de justicia para encontrar la verdad: la vista pública con oportunidad de interrogar y contrainterrogar.

fueron las razones que se utilizaron para obtener la firma de Aguayo. (²¹)

"Yo realmente no conocía detalles de este caso pero me informé con el propio Sr. Aguayo y en cuanto a los detalles él mismo los ha manifestado en esta mañana. A pesar de eso, fue a sugerencia del compañero Rodríguez Ema, no hice más ninguna manifestación porque él me lo solicitó y fue a mi oficina más tarde, me explicó que era una cuestión de utilidad pública muy importante, entonces mi intervención se limitó solamente a gestionar del Sr. Aguayo si era posible como una cuestión patriótica más que nada, de civismo, que él se interesara en que esta cosa se resolviera, como una cuestión de utilidad pública."    (T. E. pág. 216.)

"  .      .      .      .      .      .      .      .

"P. ¿La conclusión que usted obtuvo de esa conversación con el Sr. Aguayo fue que el Sr. Aguayo en esos momentos no tenía interés alguno en este asunto, que en cuanto a la propiedad se refiere habían terminado sus relaciones con la Autoridad Sobre Hogares?

"R. Me dio esa impresión.    Ahora, quiero aclarar que más tarde yo quise gestionar con él y le intenté (sic) de que él tratara por cuestiones de civismo y de patriotismo también de que se interesara en este asunto ya que él tenía hasta otra casa." (T. E. pág. 226.)

"  .      .      .      .      .      .      .

"R. El Sr. Aguayo tenía mucha confianza en mí y me dijo: 'Bueno'.    Siempre él ponía ciertas condiciones, que él no es hombre de pleitos, que él es hombre pacífico y no quiere verse envuelto en nada y mucho menos tener que gastar en litigios, pero yo le expliqué que se trataba de una cuestión de interés público que estaban envueltos muchos millones de pesos, según me habían informado y según yo había podido comprobar por la prensa; él no me hizo una promesa fiel pero sí accedió hasta cierto punto.

"P. ¿Accedió a qué?

"R. A complacerme a mí en el sentido de que pusiera de su parte para que este caso se pudiera resolver."    (T. E. pág. 227.)

---

(²¹) Rodríguez Ema declaró (T. E. pág. 478) que antes de visitar a Aguayo, Ramírez le manifestó que Aguayo estaba dispuesto a "seguir con la acción" y que en la entrevista subsiguiente se le habló a Aguayo del "interés de él.    Porque interés público me parece a mi que siempre lo [el caso] ha tenido."    (T. E. pág. 480.)

Pasemos ahora a considerar la manera en que se desarrolló el caso y el control que sobre el mismo tuvo la Autoridad. Hemos señalado anteriormente que fue el Lic. Rodríguez Ema, abogado de la Autoridad, quien seleccionó al Lic. Jorge V. Toledo para que actuara como abogado de Martín Aguayo. Esta selección se hizo por razones "de confianza, de amistad y de vecindad". (T. E. pág. 458.) Toledo y Rodríguez Ema tenían oficinas en el mismo piso del mismo edificio, donde también estaban las oficinas del Lic. Rafael B. Pérez Mercado, para entonces Jefe de la División Legal de la Autoridad. El acuerdo entre Toledo y Rodríguez Ema, según lo explica éste último, fue en el sentido de que Rodríguez Ema trataría de que la intervención de Toledo "le representara lo menos onerosa posible en el sentido de trabajo clerical y trabajo de 'research' y todo eso." (T. E. pág. 459.) Rodríguez Ema le pidió a Toledo que se pusiera de acuerdo con Pérez Mercado para la redacción final de cualquier documento.

Toledo por su parte explica que aceptó llevar el caso "como una cooperación con el compañero [Rodríguez Ema], como él ha tenido atenciones conmigo también." (T. E. pág. 161.) ". . . [E]n realidad ese era un caso en que yo no estaba interviniendo . . . sino mas bien en cortesía con el compañero y no hice todas las gestiones . . ." (T. E. pág. 150.) Y añade: ". . . no podía decir que era un caso de esos que uno en realidad ha sido contratado específicamente y que ya tiene otra clase de interés. Más bien era el interés que sabía que existía una cuestión de interés público de que se resolviera el asunto y la autorización que me había dado el señor Aguayo. De manera que la intervención que tuve, todas esas relaciones, y, además, estaba en continuas consultas con el que había originado el asunto de la solicitud del señor Aguayo, con el señor Rodríguez Ema." (T. E. págs. 161–162.)

Como consecuencia del entendido con Rodríguez Ema, Toledo se avino a prestar sus servicios gratuitamente y a recibir toda clase de ayuda de los abogados de la Autoridad.

No obstante plantearse en el caso importantes cuestiones de orden constitucional, Toledo no solicitó una vista en el Tribunal Superior ni sometió un informe escrito para explicar las alegaciones de su cliente.

Un examen de lo ocurrido entre Toledo y Aguayo demuestra que entre ellos no hubo nunca las relaciones usuales de abogado y cliente. Aparte de los hechos ya mencionados de que Aguayo no seleccionó a Toledo como su abogado ni le pagó por sus servicios, otras circunstancias dan fuerte apoyo a la anterior conclusión. Toledo mantuvo a su cliente completamente al margen de lo que acontecía en el caso. No le informó sobre las cuestiones constitucionales planteadas en la Estipulación, ni sobre la sentencia del Tribunal Superior, ni solicitó su consentimiento para apelar de esa sentencia. Sin haberla mostrado a Aguayo, ni hablarle del asunto sometió al Tribunal Superior una moción solicitando permiso para retirar los fondos depositados por la Autoridad, en la cual aparece Aguayo comprometiéndose a "reintegrar la suma envuelta en este caso al serle devuelta la posesión de su propiedad." Declaró en la vista el Lic. Toledo:

"Y para esa época de la apelación el compañero Pérez Mercado me entrevistó al efecto de que el señor Aguayo interesaba que se le diera el dinero depositado para no estar esperando una decisión posterior. Yo no hablé al señor Aguayo sobre eso, sino que preparamos la moción, que fue notificada a la otra parte y entonces, se le pidió el dinero al tribunal y se le entregó al señor Aguayo. De hecho yo tampoco sé quien se lo entregó." (T. E. pág. 146.)

Se desprende también de este testimonio que en la única ocasión en que tuvo que hacer una solicitud relacionada con su propiedad, Aguayo recurrió directamente a los abogados de la demandante y no al que oficialmente lo representaba.

Rodríguez Ema declaró que antes de firmarse la Estipulación, Aguayo y él sostuvieron una entrevista con Toledo en la oficina de éste último y por espacio de diez a quince minutos. En esa entrevista Rodríguez Ema habló delante de Aguayo

de que en el caso se iba a plantear ". . . si se podía coger la propiedad privada mediante expropiación para después venderla a empresa privada, y si la casa de él era una casa que caía dentro de lo que se puede llamar . . ." y afirmó que en esa ocasión no se le leyó a Aguayo la Estipulación de hechos aunque ya estaba redactada.   (T. E. pág. 469.)   Aguayo negó enfáticamente que esa entrevista hubiese tenido lugar, afirmó nunca había estado en San Juan en gestiones relacionadas con el caso y sostuvo que la primera vez que había visto a Toledo había sido en el Tribunal Supremo en la vista del 8 de enero de 1958.   No creemos necesario hacer una determinación sobre este conflicto de prueba.   Aun aceptando la versión de Rodríguez Ema tal entrevista es de por sí claramente insuficiente para alterar la conclusión que surge de los otros hechos en el sentido de que entre Toledo y Aguayo nunca existió una verdadera relación de abogado y cliente.

Prueba definitiva de lo anterior es la conducta de Toledo a raíz de las manifestaciones del Lic. Ramírez publicadas en la prensa.   Se recordará que Ramírez afirmó, como "abogado de Martín Aguayo", que éste había vendido su propiedad a la Autoridad, que el caso era "académico" y se seguía llevando con fines distintos de los que se alegaban.   ¿Qué hace Toledo al tener conocimiento de estas graves imputaciones que ponían en entredicho sus relaciones con Aguayo y su responsabilidad profesional en el caso?   En lugar de cerciorarse personalmente de si eran o no ciertas, [22] delega en los abogados de la Autoridad [23] para que sean éstos los que se entrevisten con Aguayo, y entiende cumplida su función profesional al firmar,

---

[22] Toledo aceptó en su declaración que "Quizás no hice bien en no haber ido inmediatamente a Arecibo . . ."   (T. E. pág. 167.)

[23] Rodríguez Ema declaró que él fue a Arecibo "para clarificarle la situación al compañero Toledo . . ."   (T. E. pág. 487.)   El Lic. Pablo Defendini, quien sucedió al Lic. Pérez Mercado en la jefatura de la División Legal de la Autoridad, declaró que él había aconsejado se sometiera la moción a este Tribunal "por la situación difícil aparentemente en que estaba el compañero Toledo, a mi juicio en este caso" (T. E. pág. 409) y que al acompañar a Rodríguez Ema a Arecibo entendió que este último "iba en representación del compañero Toledo."   (T. E. pág. 434.)

junto a Aguayo y uno de los abogados de la Autoridad, una moción dirigida a este Tribunal en la que los litigantes sencillamente afirman tener interés en que el caso continúe pero sin contradecir las graves acusaciones publicadas en la prensa. Añádase a esto que Toledo no podía tener conocimiento personal de los argumentos que se utilizaron para lograr que Aguayo firmase la moción, que Toledo examinó la moción antes de que Rodríguez Ema la llevara a Arecibo pero luego el Lic. Ramírez y los abogados de la Autoridad le eliminaron un párrafo y fue esta versión modificada la que firmó Aguayo, y finalmente que no hay prueba de que a Aguayo tan siquiera se le ocurriera preguntar durante la entrevista cuál era el criterio de su abogado. A la luz de todos los hechos que hemos reseñado no cabe duda de que el Lic. Jorge V. Toledo nunca fue realmente el abogado de Martín Aguayo en este recurso y que la representación que ostentó fue puramente nominal.

Además del extenso dominio que ya hemos descrito, los abogados de la Autoridad realizaron otros actos que le dieron un control completo del litigio. La Estipulación con que se inició el caso fue redactada por el Lic. Rafael B. Pérez Mercado, para entonces Jefe de la División Legal de la Autoridad. Declaró éste en la vista:

"Entonces me puse en comunicación con el compañero Toledo, que por cierto tenemos la oficina en el mismo edificio, tanto Rodríguez Ema como Toledo y yo tenemos la oficina en el mismo edificio. Discutimos los posibles puntos en controversia: él me habló principalmente de esa cuestión de que el Sr. Aguayo que su finca ni su casa no era una casa de arrabal, bueno, y efectivamente no la era, era en buenas condiciones con su servicio sanitario, una calle buena, en fin que no tenía problema alguno de falta de sanidad. En vista de eso yo le sugerí al compañero Toledo: 'Bueno, si ustedes van a plantear la ilegalidad de esta legislación en cuanto a ese aspecto, pues, mejor es que sometan ya de una vez otras cuestiones y cuantas cuestiones puedan surgir, de suerte que tengamos, si vamos a tener una resolución definitiva y amplia en donde todos los problemas constitucionales que se puedan presentar queden definitivamente resueltos.' Y

eso se lo dije conociendo como conocía las objeciones de esta firma de Nueva York que representan los bonistas, los inversionistas, a hacer inversiones de fondos de sus clientes sin estar seguros de que no habría problema ninguno en cuanto a la ilegalidad de la ley. Bueno, estuvo conforme Toledo, nos sentamos, discutimos, estuvimos varios días discutiendo las posibles cuestiones a levantarse y las posibles objeciones a las leyes, tomé nota de todas las cuestiones posiblemente envueltas y las que podían levantar y entonces en la oficina yo redacté la estipulación, le di forma ya definitiva a la estipulación con que habríamos de iniciar el pleito. Claro está, en esa estipulación traté de presentar ante el Tribunal todo el problema de renovación . . ." (T. E. págs. 342–344.)

De ahí en adelante toda la tramitación del caso estuvo a cargo de los abogados de la Autoridad, quienes redactaron y sometieron al Tribunal Superior todos los documentos pertinentes, excepto el escrito de apelación que fue preparado por Toledo. La Estipulación, el proyecto de opinión y sentencia, la moción de retiro de fondos y la transcripción de los autos fueron de la responsabilidad de los abogados de la Autoridad.

El mismo control siguió ejerciéndose por la Autoridad una vez el caso llegó a este Tribunal. Sus abogados tuvieron a su cargo todos los trámites y dominaron efectivamente los planteamientos al controlar los alegatos de ambos litigantes. El alegato de la demandante, como era natural, estuvo a cargo de su abogado principal, Lic. Pérez Mercado, en consulta con el Lic. Aurelio Torres Braschi, Jefe de la División de Litigios del Departamento de Justicia. Sin embargo, la preparación del alegato del demandado Martín Aguayo estuvo principalmente a cargo del Lic. Antonio J. Amadeo, quien sostenía con la Autoridad las mismas relaciones profesionales que el Lic. Rodríguez Ema. Este último explicó la situación de la siguiente manera:

"P. ¿Y por qué razón si Amadeo era por así decir, pues el abogado del señor Aguayo, digo por qué no aparecía él en el pleito firmando las alegaciones?

"R. Porque yo no se lo pedí a Amadeo. Y si se lo hubiese pedido hubiese tenido el mismo problema mío.

"P. En otras palabras, ¿Amadeo en realidad estaba controlando el pleito con Toledo, de Aguayo?

"R. No creo que pudiera yo afirmar eso.

"P. ¿Pero si él hacía el alegato en la apelación?  Digo, el abogado que hace el alegato controla la apelación.

"R. Bueno, él hizo todo el 'research' para sustanciar ese alegato.  Y parte sustancial de ese alegato.

"P. ¿De manera que usted no diría que él controlaba la apelación?

"R. No.  Parte de ella.

"P. ¿Si hubiese surgido una discrepancia en cuanto a los puntos a plantearse o en cuanto a la forma de argumentar, la forma de presentarlos, no hubiese tenido él, puesto que él estaba haciendo el 'research' que determinar cómo se iban a plantear y en qué forma?

"R. Bueno, indudablemente."   (T. E. págs. 464–465.)

Recuérdese, además, que la moción de 8 de octubre de 1957 en la cual los litigantes hicieron constar su interés en el caso y su deseo de que este Tribunal lo resolviera fue preparada por los abogados de la Autoridad, quienes junto al Lic. Ramírez también se encargaron de hablar con Martín Aguayo y de lograr que éste la firmara.

Es muy significativo, además, y constituye prueba adicional del completo control que la Autoridad ha ejercido sobre este caso y de las peculiares relaciones entre Martín Aguayo y el Lic. Jorge V. Toledo, que luego de la vista del 8 de enero en la cual su cliente repetidas veces declaró bajo juramento que no había tenido ni tenía interés alguno en este caso, Toledo no haya sometido una explicación o algún planteamiento a este Tribunal no obstante constarle que tanto la Autoridad como el Estado Libre Asociado han sometido informes insistiendo en que Martín Aguayo tiene interés en este caso y que el mismo debe resolverse en su fondo.  Una vez más, el abogado de Martín Aguayo ha delegado la representación de su cliente en los abogados de la Autoridad.

Otras actuaciones de la Autoridad comprueban su completo dominio del litigio.  Como señaláramos anteriormente, la Autoridad permitió a Martín Aguayo retirar del Tribunal

Superior la suma de $2,850 luego del demandado haber sometido su escrito de apelación y sin que el tribunal hubiese decretado la adquisición de la propiedad por los demandantes. El título de la propiedad, en esas circunstancias, ha seguido perteneciendo al demandado [24] y la Autoridad tiene, como única protección legal para esos fondos públicos en caso de resultarle adversa la determinación judicial, una promesa hecha por el abogado de Martín Aguayo sin el consentimiento de éste, en la que el demandado se compromete, si pierde el caso, a devolver el dinero que ha recibido. Es obvio que en tal caso y si no hubiese una devolución voluntaria, la Autoridad tendría que iniciar una acción contra Aguayo para compelerle a devolver el dinero.

En segundo término, la Autoridad ordenó y llevó a cabo la destrucción total de la casa de Aguayo, aunque no ha obtenido título sobre la propiedad y, por consiguiente, se expone a una acción por daños, y aunque la promesa del demandado de reintegrar el dinero recibido tiene por base se le devuelva su propiedad.

Estas actuaciones pueden tener una sola explicación: la completa seguridad de los funcionarios y abogados de la Autoridad de que Martín Aguayo no ha tenido ni tiene interés personal en este asunto y que el dominio que la Autoridad tiene del litigio le asegura, no importa el resultado final, que los fondos públicos no han de estar en peligro. Si se rechaza esta explicación, las mencionadas actuaciones serían indicativas de negligencia oficial en la protección del dinero de la Autoridad.

En resumen, el peso abrumador de los hechos probados ante este Tribunal demuestra concluyentemente que: Primero, la demandante Autoridad sobre Hogares gestionó se incoara este recurso y participa en el mismo con el único propósito de obtener una opinión de este Tribunal sobre la constitucionalidad de las leyes de renovación urbana para así

---

[24] Así lo aceptó el Lic. Pérez Mercado en su declaración.

disipar las dudas de ciertos funcionarios federales y de los abogados de los bonistas de la Autoridad. Segundo, (*a*) el demandado Martín Aguayo nunca ha tenido ni tiene interés personal y real en este litigio y no desea proseguir con el mismo, (*b*) inicialmente accedió a figurar como demandado porque esa acción no le representaba gastos y molestias de clase alguna, (*c*) al recibir el dinero de la Autoridad creyó le había vendido su propiedad, y (*d*) aceptó más tarde continuar con el litigio por motivaciones de "patriotismo y civismo" y para "complacer" a un amigo. Tercero, no puede haber tampoco el menor resquicio de duda de que la Autoridad sobre Hogares dominó completamente ambos lados de este litigio, (*a*) al seleccionar el abogado del demandado, (*b*) sufragar todos los gastos, (*c*) encargarse de todos los trámites, (*d*) controlar el estudio y redacción de todos los documentos (excepto el escrito de apelación) incluyendo la Estipulación y los alegatos de ambas partes, y (*e*) al canalizar, a través de sus abogados, las relaciones entre el demandado y su abogado y convertirlas en relaciones puramente nominales. Solamente alterando los hechos para acomodarlos a un resultado preconcebido podría arribarse a conclusiones distintas.

## III

Las partes interpusieron el presente recurso amparándose en la Regla 7 (*d*) de las Reglas de Enjuiciamiento Civil, la cual dispone lo siguiente:

"(d) *Caso Estipulado; Procedimiento.*—Las partes en una disputa que pueda dar lugar a una acción civil pueden, sin alegaciones, radicar, en la corte que tendría jurisdicción si la acción se hubiera iniciado, una estipulación de hechos acompañada de una declaración jurada al efecto de que existe una controversia real y efectiva y que se radica de buena fe para determinar los derechos de las partes. Las cuestiones entonces se considerarán una acción en controversia y todos los procedimientos posteriores se ajustarán a estas reglas."

Nunca ha existido una disposición similar en las Reglas federales ni en nuestro Código de Enjuiciamiento Civil [25] aunque sí las hay en la mayoría de los estados. La extraordinaria similaridad de los textos nos induce a creer que la nuestra se tomó de Colorado, [26] aunque en California [27] y Nueva York [28] existen también reglas bastante similares a ella.

No puede haber duda en cuanto al propósito de la Regla 7(d). Se trata de ofrecer a los litigantes, cuando entre ellos no hay disputa sobre los hechos, un medio rápido y barato de obtener una sentencia judicial y de someter eventualmente a un tribunal de apelación cuestiones de derecho que estén en controversia. *Marx v. Brogan*, 81 N. E. 231 (N. Y., 1907); Anotación en 97 A.L.R. 301. Se elimina de esta manera el largo y muchas veces engorroso trámite que exige el procedimiento ordinario haciéndose un planteamiento directo al tribunal y prescindiéndose de los trámites de alegaciones, notificación, mociones incidentales y prueba.

No obstante estas ventajas, el "caso estipulado" sigue manteniendo, por imperativo de ley y de constitución, las características esenciales de un procedimiento judicial. Tiene que existir una controversia real entre las partes, sometida de buena fe ante un tribunal competente y que pueda ser objeto de dictamen judicial. La sentencia que dicte el tribu-

---

[25] Tanto en la jurisdicción federal como en la nuestra se permite a las partes someter estipulaciones sobre los hechos luego de que una causa comienza de la manera ordinaria. La jurisprudencia federal consta en 2 Am. Jur., *Agreed Case*, sec. 3, pág. 366. En cuanto a Puerto Rico véase *The Fajardo Development Co. v. Camacho*, 31 D.P.R. 844, 848 (1923). Las diferencias importantes entre un "caso estipulado" y una "estipulación de hechos" se discuten en 2 Am. Jur. pág. 367 y en 97 A.L.R. 301.

[26] Las reglas son idénticas aparte de dos leves diferencias de estilo y de que la regla nuestra, contraria a la de Colorado, exige que la controversia además de "real" sea "efectiva" ("substancial"). 1 *Colorado Statutes Annotated* (1935) pág. 29.

[27] Deering, *Civil Procedure and Probate Codes of California*, (1949) Sec. 1138; *West's Annotated California Codes, Civil Procedure* (1955) Sec. 1138.

[28] *Civil Practice Act* sec. 546, *Thompsons Laws of New York* (1939) pág. 1688; 23 Abbott, *New York Digest 2d.* 809 (1955).

nal deberá ajustarse a los hechos estipulados y surtirá los mismos efectos que si procediera de un juicio ordinario.

Nuestra Regla 7 (*d*) incorpora estos requisitos esenciales. Exige que la controversia sea "real y efectiva" (en inglés "real and substantial") imprimiendo así aún mayor énfasis a este requisito de lo que lo hacen las disposiciones de Colorado, California y Nueva York. Se acentúa esta exigencia mediante el uso de las frases "disputa que pueda dar lugar a una acción civil" ("a dispute which might be the subject of a civil action") y "una acción en controversia" ("an action at issue"). No cabe duda, por consiguiente, que la Regla 7 (*d*) no solamente no constituye excepción a la norma básica que exige una controversia real entre las partes de un litigio, sino que además, y obviamente con el propósito de que no pudiera utilizarse para cobijar acciones ficticias, colusorias o académicas, [29] expresamente requirió de las partes atestiguar bajo juramento tanto su buena fe como la existencia entre ellas de una "controversia real y efectiva".

Debemos, por consiguiente, examinar el contenido de la frase "controversia real". No es necesario, sin embargo, explorar las infinitas variaciones y los innumerables refinamientos que le han añadido cientos de tribunales y docenas de comentaristas, durante los siglos transcurridos desde su génesis en el derecho común inglés hasta nuestra época. Es suficiente, para los limitados propósitos de esta opinión, examinar los problemas específicos que plantea el presente caso.

El Tribunal Supremo federal ha establecido [30] que una

---

[29] *Nott* v. *Klein*, 285 N.Y.S. 1025, 1026–27 (1935).

[30] *Aetna Life Insurance Co.* v. *Haworth*, 300 U. S. 227, 240 (1937) y casos citados: *Muskrat* v. *United States*, 219 U. S. 346, 356 (1910); 1 *Cyclopedia of Federal Procedure* (1951) pág. 112. ". . . Las cortes no están constituídas con el fin de resolver cuestiones de derecho especulativas y abstractas, o para establecer reglas que sirvan de norma futura a las personas en sus negocios y relaciones sociales; sino que están limitadas en su acción judicial a las verdaderas controversias en que necesariamente están envueltos los derechos legales de las partes y que pueden ser resueltos concluyentemente." *Bianchi* v. *Pierazzi et al.*, 25 D.P.R. 631, 636 (1917). Véase, 2 Bancroft, *Code Pleading, Practice and Remedies* (1937) págs. 1325–26.

"controversia debe ser definida y concreta, afectando las relaciones jurídicas de partes que tengan intereses jurídicos antagónicos". Debe ser "real y substancial" y permitir "un remedio específico mediante una sentencia de carácter concluyente, a diferencia de una opinión que exprese cuál sería el derecho aplicable a unos hechos hipotéticos". Debe ser "propia para una determinación judicial" y "se distingue de una diferencia o disputa de carácter hipotético o abstracto; de una que sea académica o ficticia".

Una de las definiciones más aceptadas explica que un caso académico (*moot*), por el contrario, es "uno en que se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes que éste haya sido reclamado, o una sentencia sobre un asunto, que al dictarse, por alguna razón no podrá tener efectos prácticos sobre una controversia existente . . . (31)

Uno de los elementos esenciales de una controversia real lo constituye el interés opuesto o antagónico de las partes. Pueden existir intereses opuestos sin que haya hostilidad entre los litigantes, y los tribunales no sólo aprueban sino que estimulan la presentación de "pleitos amigables". (32) También son aceptables los litigios en que se trata de someter una ley o actuación oficial a prueba (*test case.*) (33) En todas las ocasiones, sin embargo, y no empece las motivaciones de las partes, tiene que haber una controversia genuina y viva, en la cual estén presentes intereses opuestos, y que al ser resuelta afecte las relaciones jurídicas de los litigantes. (34)

(31) *Ex parte Steele*, 162 Fed. 694, 701 (N.D. Ala. 1908).

(32) *Lord* v. *Veazie*, supra; *Ward* v. *Alsup*, supra; *The Fajardo Development Co.* v. *Camacho*, 31 D.P.R. 844, 848 (1923); *Ex parte Steele*, supra; *Florsheim* v. *Board of Commissioners*, 212 Pac. 451, 453 (N. M., 1922); Anderson, *Actions for Declaratory Judgments* (1951), pág. 167; Borchard, *op. cit.*, pág. 38.

(33) *Adams* v. *Union R. Co.*, 42 Atl. 515, 517 (R. I., 1899); *State ex rel. Attorney General* v. *Dolley*, 108 Pac. 846 (Kan., 1910); *W. E. Bowen Improvement Co.* v. *Van Haften*, 238 S. W. 147 (Mo., 1922); Borchard, *op. cit.*, pág. 38; Anderson, *op. cit.*, pág. 169.

(34) "Se habla del pleito, en las declaraciones juradas que han sido sometidas para sostenerlo, como de una acción amigable, y el procedimiento

"El tribunal debe estar alerta para distinguir el caso ficticio o colusorio en el cual sólo se pretende obtener información o una opinión, o en el cual el demandado aparece como una figura decorativa con el único propósito de darle jurisdicción, de aquellos en que hay derechos en controversia con el fin de lograr una determinación obligatoria." Borchard, *op. cit.*, pág. 39.

No ofrece dificultad alguna establecer tal diferencia en este caso. El propio demandado declaró bajo juramento ante este Tribunal que nunca tuvo ni tiene interés alguno en el pleito y que no quiere continuar con el mismo. Los testimonios confirman plenamente esa aseveración y explican las razones por las cuales se interpuso el recurso y por las que el demandado aceptó figurar y continuar en el pleito. En segundo lugar, la prueba demuestra concluyentemente que la demandante Autoridad sobre Hogares tuvo completo dominio de ambos lados del litigio desde su incepción hasta el presente. Estos elementos son claramente suficientes para decretar que tenemos ante nos un pleito ficticio, incoado con el único propósito de obtener una opinión de este Tribunal sobre la constitucionalidad de las leyes de renovación urbana y de disipar así

---

ha sido defendido por ese fundamento. Pero una acción amigable en el sentido en que estas palabras se usan en las cortes de justicia supone previamente la existencia de una verdadera disputa entre las partes con relación a cierta cuestión de derecho. Y en un caso como ese a veces ocurre que con el fin de obtener una decisión de la controversia, sin incurrir en gastos y molestias innecesarios, convienen ellas en llevar adelante el pleito en una forma amistosa, es decir, que no habrá molestia entre una y otra parte con formas o tecnicismos innecesarios, y mutuamente admitirán los hechos conocidos por ellas como ciertos, y sin exigir prueba, y traerán la cuestión en disputa ante una corte para su decisión, sin exponerse a incurrir en gastos o demora innecesarios. Pero debe realmente existir una verdadera controversia e intereses adversos. La amistad consiste en la forma en que la acción se presenta para ser discutida ante la corte. Y tales acciones amigables, lejos de ser objeto de censura, son aprobadas y favorecidas, pues ellas facilitan grandemente la administración de justicia entre las partes. La objeción que hay en el caso ante nuestra consideración no es que los procedimientos fueron amigables sino que no existe verdadero conflicto de interés entre ellas; que el demandante y el demandado tienen el mismo interés, y que ese interés es adverso y está en conflicto con el interés de terceras personas cuyos derechos serían grandemente afectados si la cuestión de derecho fuera resuelta en la forma en que lo desean ambas partes en ese pleito." *Lord* v. *Veazie*, supra, pág. 254.

las dudas de ciertos funcionarios federales y de los abogados de los bonistas de la Autoridad.(35)

No creemos que el primer aspecto requiera análisis jurídico ulterior. Probado que una de las partes nunca tuvo interés en el pleito, o que ese interés ha cesado en virtud de determinadas circunstancias o que es claramente insustancial o efímero, procede desestimar el recurso por no existir una controversia real. Diamond, *op. cit.*, págs. 130–131; Borchard, *op. cit.*, págs. 38–40; Anderson, *op. cit.*, pág. 58; Robertson and Kirkham, *op. cit.*, págs. 494–96, 509–17, 518–36, 541–78; *Lord v. Veazie*, supra; *Bell & Howell Co. v. Bliss*, supra; *Smith v. The Junction Railway Co.*, 29 Ind. 546 (1868); *Williams v. Van Deusen*, 219 S. W. 395, 397 (Mo., 1920); *Stearns v. Wood*, 236 U. S. 75 (1915); *Barley v. Johnson County*, 54 Pac. 80 (Cal., 1898); *Fairchild v. Hughes*, 258 U. S. 126 (1922); *Massachussetts v. Mellon*, 262 U. S. 447 (1923); *Sprunt and Sons v. United States*, 281 U. S. 249 (1930); *Arkansas-Missouri Power Co. v. City of Kennett*, 78 F.2d 911 (C.C.A. 8, 1935).

Está firmemente establecido el principio de que no existe una controversia real cuando en un litigio una de las partes se convierte en el *dominus litis* de ambos lados. Esta condición destruye el carácter adversativo del pleito y obliga al tribunal concernido a desestimar la causa. *Haley v. Eureka County Bank*, supra; *South Spring Gold Co. v. Amador Gold Co.*, supra; *United States v. Johnson*, supra; *American Wood*

(35) Constituye hoy día motivo de gran preocupación para los gobernantes y estudiosos del sistema federal norteamericano la manera en que la soberanía y autonomía de los gobiernos estatales ha ido reduciéndose ante el crecimiento inusitado del gobierno federal. Una de las causas del actual desbalance nace de la gran fortaleza económica del gobierno federal, que le permite hacer donaciones (*grants-in-aid*) a los estados a la vez que impone numerosos requisitos en cuanto a los propósitos para los cuales pueden usarse los fondos federales y la manera de gastarlos. Un buen estudio del problema y las fuentes principales se encuentran en John Pryor Furman, *Impact of Federal Subsidies on State Functions*, 43 A.B.A.J. 1101 (1957). La experiencia de varios sistemas federales, incluyendo el norteamericano, se describe en Robert R. Bowie y Carl J. Friedrich (Eds.), *Studies in Federalism* (1954) págs. 360, 370–373; y en K. C. Wheare, *Federal Government* (1953) págs. 101–103, 115–123, 158–159.

*Paper Co.* v. *Heft*, supra; Robertson and Kirkham, *op. cit.* pág. 517. Es también contraria a la política pública porque impide un examen judicial justo y completo de los méritos del caso. *O'Morrow* v. *Borad*, 167 P.2d 483, 486 (Cal., 1946). El principal precedente en la jurisdicción federal lo constituye el caso de *United States* v. *Johnson*, 319 U. S. 302 (1943). Por la extraordinaria similaridad que guardan sus hechos con los del presente recurso debemos reproducir aquí algunos párrafos de la opinión del Tribunal Supremo federal:

"La declaración jurada del demandante, sometida por el Gobierno junto a su moción para que se desestime el pleito por ser colusorio, demuestra sin contradicción que el demandante interpuso este procedimiento usando un nombre ficticio; que se instituyó como "un pleito amigable" a petición del apelado; que el demandante no empleó, ni pagó, ni tan siquiera conoció al abogado que compareció en su representación; que no tenía conocimiento de quién había pagado los derechos de presentación ($15.00) en la corte de distrito, pero el apelado le aseguró que como demandante no tendría que incurrir en gastos al incoar el pleito; que no leyó la demanda que se presentó en su nombre y como demandante; que en sus conversaciones con el apelado y con el abogado de éste no se mencionó la cuestión de triple daño y él no tuvo conocimiento del monto de la sentencia hasta que lo vió en un periódico de la localidad.

"La declaración jurada del apelado no niega estas alegaciones. Admitió que el abogado del apelado había conseguido un abogado para que representara al demandante y le había asegurado a éste que no sería necesaria su presencia en la corte durante el juicio. La opinión de la corte de distrito demuestra que no se le sometió un alegato a nombre del demandante.

"El Gobierno no alega que en virtud de la cooperación de las dos partes originales del litigio, se hubiese presentado a la corte una relación de hechos falsa o ficticia. Pero insiste en que las declaraciones juradas demuestran que no existe una genuina cuestión adversativa entre las partes, sin la cual una corte no puede con entera seguridad dictar sentencia, especialmente cuando asume la grave responsabilidad de dictaminar sobre la validez constitucional de una actuación legislativa. Aún en un litigio que solamente afecta derechos privados, no puede permitirse que una sentencia quede en pie cuando una de las partes ha

dominado el curso del litigio pagando los honorarios de ambas partes.   (Caso.)

"En este caso hay un interés público importante en juego —la validez de una ley del Congreso que tiene efectos profundos sobre el bienestar público en uno de los períodos más críticos de la historia de este país.   Se ha dictaminado sobre ese interés en un procedimiento en el cual el demandante no ha tenido participación activa, ni ejerció control alguno, ni sufragó los gastos. Estuvo representado sólo nominalmente por un abogado a quien seleccionó el abogado del apelado y a quien nunca ha visto.   Un caso así es colusorio porque en realidad no es adversativo.   No presenta "la real y honesta afirmación de derechos" para ser adjudicados—una garantía que es esencial a la integridad del proceso judicial y la cual hemos considerado indispensable a la adjudicación de cuestiones constitucionales por esta Corte.   (Casos.)   Si durante el curso de un litigio se da a conocer a una corte este defecto en los procedimientos, ésta puede anular cualquier fallo que así se haya obtenido y ordenar el archivo de la causa sin emitir un dictamen sobre los méritos.   Es deber de la corte hacerlo cuando, como ha pasado aquí, el interés público ha sido puesto en peligro por las amenidades de las partes en un pleito conducido bajo el control de sólo una de ellas."   (Págs. 303–05.)

Los demandantes pretenden distinguir el caso de *Johnson* del de autos sobre la base de que en el primero se trataba de "una colusión entre partes privadas *contra* el interés público" mientras que en el que nos ocupa "el acuerdo amigable de las partes para la sumisión de la controversia, de catalogarse como colusorio, habría que llamarle colusión a *favor* del interés público." (Bastardillas de los demandantes.)   Sostienen, además, que la Autoridad asumió los gastos del pleito "sin intención de perjudicar a nadie y sólo con el interés público en mente."

Este planteamiento tiene dos fallas esenciales.   En primer término, supone que el control de la Autoridad sobre este litigio se funda exclusivamente en haber sufragado todos los gastos del mismo.   La prueba, sin embargo, demuestra concluyentemente que éste fue sólo un aspecto del completo dominio que la demandante ejerció sobre ambos lados de este recurso.

Aunque la jurisprudencia federal sostiene que un pleito se convierte en colusorio por el simple hecho de que una de las partes pague los honorarios de los abogados de todos los litigantes, ([36]) no hemos adoptado esa norma en nuestra jurisdicción, *Géigel* v. *Ramos*, 79 D.P.R. 862, 864 (1957). Tampoco la han seguido varios de los estados. ([37]) Ese es, sin duda, un hecho que debe considerarse al determinar si un caso es o no colusorio o ficticio, pero existen situaciones, como la de *Géigel* v. *Ramos*, en las cuales puede permitirse la mencionada práctica. Los abogados deben, desde luego, informar esa circunstancia al tribunal y éste, antes de proseguir con el caso, debe quedar satisfecho de que no se trata de una actuación colusoria o de un pleito ficticio. Repetimos, sin embargo, que en el presente recurso la demandante no solo sufragó todos los gastos sino que controló totalmente el litigio.

En segundo término, no cabe distinguir el caso de *Johnson* del de autos porque en aquél los litigantes fueran ambos personas privadas y en éste comparezcan personas públicas como demandantes. La cuestión crucial es si se trata o no de un pleito colusorio, ficticio o académico y no la de quiénes son los litigantes. Obviamente, no podemos permitir a persona alguna, no importa su condición o categoría, hacer uso indebido de los procedimientos judiciales. Tampoco que sepamos lo ha permitido ninguna otra jurisdicción. *Cf. Meyers* v. *Cheesman*, 174 Fed. 783, 786 (C.C.A. 4, 1909) ; *People* v. *American Sugar Refining Co.*, 148 N.Y.S. 160, 164 (1914) ;

---

([36]) *Gardner* v. *Goodyear Dental Vulcanite Co.*, supra; *Cleveland* v. *Chamberlain*, supra; *United States* v. *Johnson*, supra.

([37]) En *City and County of San Francisco* v. *Boyd*, 140 P.2d 666, 670 (Cal., 1943) citado por los demandantes en apoyo de su contención, dijo el Tribunal:

"El hecho de que las partes opuestas hayan sido autorizadas para contratar abogados a quienes se les paga de los fondos públicos, no hace el caso colusorio, pues la fuente común de esos pagos no le da control a una parte sobre la preparación y discusión del caso. Nada en el récord ante nos indica que la junta de supervisores seleccionara el abogado del demandado ni que a nombre de éste ejerciera algún control sobre la preparación o presentación del caso." Véanse los casos allí citados y, además, *Parker* v. *State*, 31 N. E. 1114 (Ind., 1892) ; *McCoy* v. *Carran*, 201 S. W. 463 (Ky., 1918) y *Cone* v. *Gilmore*, 155 Pac. 192 (Ore., 1916).

*Muskrat* v. *United States*, 219 U. S. 346, 361 (1910) ; *Matter of DeLucca*, 179 Pac. 853 (Cal., 1905) ; *Macklin* v. *Kaiser*, supra, pág. 141.

Considerando los hechos probados y la ley aplicable no tenemos otra alternativa sino la de resolver que este recurso no presenta una "controversia real y efectiva" como lo requiere la Regla 7(d) de las de Enjuiciamiento Civil. No es necesario, en vista de esta conclusión, examinar el problema jurídico de si el recurso cumple o no con el requisito de "buena fe" que también exige esa Regla, aunque más tarde haremos referencia a ese aspecto del caso al juzgar la conducta de los litigantes y abogados.

## IV

Debemos ahora decidir lo que sin duda es la cuestión vertebral de este caso: ¿Debe este Tribunal emitir un fallo sobre los méritos de las cuestiones planteadas en este recurso en vista del innegable interés público que revisten tales cuestiones? Los demandantes insisten en que debemos hacerlo[38] y se apoyan en *State ex rel. Atty. Gen.* v. *Dolley*, 108 Pac. 846 (Kan., 1910) ; *Adams* v. *Union R. Co.*, 42 At. 515 (R. I., 1899) ; *Blaize* v. *Hayes*, 15 So.2d 217 (La., 1943) ; *Rowe* v. *Housing Authority*, 249 S.W.2d 551 (Ark., 1952) ; y *State* v. *Rich*, 110 N.E.2d 778 (Ohio, 1953). Hemos examinado cuidadosamente esas y numerosas otras sentencias[39] y

[38] Dice el Estado Libre Asociado en su alegato: "Considerando las circunstancias peculiares del presente caso a la luz del interés social que determinó la propiciación de esta acción y considerando la enorme importancia pública que conllevaría el desestimar la apelación, creemos que este Hon. Tribunal no debe cerrar el camino a este pleito para su resolución final." El argumento relativo al interés público del caso se repite tanto en este alegato como en el de la Autoridad sobre Hogares.

[39] Situaciones similares a las de los casos citados por los demandantes se encuentran en *Moore* v. *Caldwell County et al.*, 176 S. E. 580 (N. C., 1934) ; *Matter of De Lucca*, supra; *Northridge Park Water System* v. *Donell*, 322 P.2d 25 (Cal., 1958) ; *Bailey* v. *Johnson County*, 54 Pac. 80 (Cal., 1898) ; *Golden Gate Bridge and Highway District* v. *Felt*, 5 P.2d 585 (Cal., 1931) ; *Price* v. *Sixth District Agricultural Ass'n.*, 258 Pac. 387 (Cal., 1927) ; *W. E. Bowen Improvement Co.* v. *Van Hafften*, supra; *Parker* v. *State*, supra; *McCoy* v. *Carran*, supra; *Cone* v. *Gilmore*, supra.

no hemos hallado una sola en la que un tribunal haya resuelto un recurso en su fondo luego de demostrársele que una de las partes nunca tuvo interés en el litigio ni desea continuar con él y que la otra parte tuvo completo dominio de todos los trámites y planteamientos.

En *Dolley* el estado presentó una petición de mandamus contra el comisionado de bancos y el tesorero estatal para que se les obligara a reconocerle a los bancos nacionales el derecho a participar de los beneficios de cierta ley del estado. Se incluyó a varios bancos como demandados. Los aludidos funcionarios contestaron negándose a reconocer esa participación y citaron una opinión del Contralor como fuente de su negativa. Varios de los bancos interpusieron una moción de desestimación alegando no existía una controversia real entre las partes. El Tribunal Supremo de Kansas rehusó desestimar el pleito aplicando la regla, ya aprobada en esta opinión, de que un pleito puede ser amigable o puede traerse con el propósito de poner a prueba una actuación oficial, sin ser colusorio. Sostuvo que "para que pueda ejercerse el poder judicial con relación a este estatuto, debe haber una controversia real y concreta sobre él—de un lado una solicitud para que se actúe específicamente y del otro una negativa." Y añadió lo siguiente: "El hecho de que el demandante haya incluído como demandados a todas las personas que supuestamente tienen interés en derrotar su alegación, elimina cualquier sugestión de que exista el propósito de inducir al tribunal a dar un dictamen sin que ambos lados de la cuestión hayan sido debidamente presentados" (Pág. 848.) Aún así el Tribunal mantuvo viva la moción de desestimación para que en el futuro pudiera determinarse si era o no cierta la alegación de que ningún banco nacional había solicitado participar de los beneficios de la ley.

En *Adams* el demandante abordó un tranvía con el único propósito de cuestionar la validez de una tarifa de diez centavos impuesta por los poseedores de la franquicia. Pagó

los diez centavos y entonces demandó a la compañía. Dijo el Tribunal Supremo de Rhode Island:

"Otra alegación de la demandada es la de que esta corte no debe considerar este pleito por ser el mismo académico, debido a que el demandado se montó en el tranvía para poder presentar un caso de prueba (*test case*). Un caso académico es aquél que trata de que se dictamine sobre una cuestión abstracta, la cual no descansa sobre hechos o derechos existentes. Cuando se prueba que existe un caso concreto de hecho o de derecho, no conocemos ningún principio o norma de ley que prive a una parte de una determinación simplemente porque su propósito al hacer valer su derecho sea el de obtener tal determinación." (Pág. 517).

En *Blaize* v. *Hayes* el demandante, quien había sido nombrado alguacil y colector de rentas por el Gobernador del estado, presentó una petición de mandamus contra el Superintendente de los Fondos Públicos y el Colector de Rentas para obligarles a hacerle entrega de la colecturía de rentas. Los mencionados funcionarios atacaron la validez del nombramiento. Cientos de contribuyentes solicitaron intervención alegando que el pleito era colusorio. Cuatro jueces del Tribunal Supremo de Luisiana dictaminaron que los contribuyentes no podían intervenir en el pleito, que se trataba de un "test case", y no de un pleito colusorio, y que existía una disputa o dudas sobre la validez del nombramiento hecho por el Gobernador, la cual el Tribunal tenía que resolver. Tres jueces disintieron sosteniendo que los contribuyentes podían intervenir, que la persona que en realidad estaba en posesión de la colecturía no era parte en el litigio y que los cargos de colusión debían ser investigados por el Tribunal.

En el caso de *Rowe* v. *Housing Authority* se atacó la validez de la ley de renovación urbana de Arkansas en una acción interpuesta por un contribuyente (*taxpayer's suit*).[40] Algunos propietarios del área afectada comparecieron ante el Tribunal Supremo alegando que el pleito era "demasiado

---

[40] A virtud de la Ley núm. 2 de 25 de febrero de 1946 (Leyes, pág. 7, 32 L.P.R.A. 3074) la acción del contribuyente está prohibida en Puerto Rico.

amigable" y solicitaron intervención para que la regla de *res judicata* no impidiese acciones futuras en que pudieran litigarse cuestiones de hecho. Ante esa situación las partes estipularon que el dictamen judicial debería limitarse a los problemas constitucionales planteados por el demandante. El Tribunal aceptó esa estipulación y procedió a resolver las cuestiones constitucionales. No hubo en este caso alegación alguna y, por consiguiente, tampoco un pronunciamiento judicial sobre el interés del demandante en la causa o sobre la manera como se había conducido el pleito.

Finalmente, en *State* v. *Rich* se sometió al Tribunal Supremo de Ohio un pleito en el que el abogado de la ciudad de Cincinnati solicitaba un mandamus contra ciertos funcionarios de la ciudad para obligarles a firmar un documento de crédito por la suma de $100,000, la cual se habría de invertir en un proyecto de renovación urbana. Los demandados contestaron negándose a realizar el acto y alegando que de hacerlo violarían sus juramentos oficiales y participarían en el expendio ilegal de fondos públicos. Algunos propietarios del área afectada intervinieron en el pleito y, entre otras defensas, plantearon al Tribunal la de que el recurso era uno amigable y que los demandados no tenían facultad para cuestionar la validez de los actos en litigio. El Tribunal rechazó esta defensa fundándose en que en el estado de Ohio se había establecido la práctica de permitir esa clase de pleitos amigables en los cuales hubiese una controversia judicial *bona fide*. Tal práctica había resultado en la emisión por la corte de lo que en realidad eran opiniones consultivas, sin el peso de los precedentes ordinarios. El Tribunal definió la norma imperante en esa jurisdicción de la siguiente manera: ". . . cuando se plantea una cuestión de interés público general algunos tribunales han adoptado el criterio de que un funcionario público puede ofrecer tal defensa en un pleito de mandamus, aun cuando existan dudas de que el demandado tenga algún derecho en el asunto." (Pág. 783.) En vista de esa práctica y de la circunstancia especial de haber intervenido

algunos propietarios en oposición a la solicitud, el Tribunal resolvió el recurso en su fondo. Obsérvese que aún en este caso, que es probablemente uno de los que más lejos ha llegado al permitir este tipo de litigios, no están presentes los factores de ausencia total de interés de una de las partes y de completo dominio del litigio por la otra que caracterizan este caso de *Aguayo.*

Sin que se entienda que estamos aprobando las normas que en ellas se aceptan, repetimos que ninguna de las decisiones judiciales citadas por los demandantes son aplicables a los hechos del caso presente. Por otro lado, el Tribunal Supremo federal y otros tribunales de apelación se han negado enfáticamente a resolver en su fondo pleitos en los cuales el interés público ha sido la *única* justificación para el ejercicio de la función judicial, aunque en algunas ocasiones, han citado ese factor como un fundamento, junto a otros, para rechazar alegaciones de que un pleito es académico. Diamond, *op. cit.,* pág. 38 y casos allí citados.

"Si, como alega el demandante, la cuestión planteada en este caso es una de gran importancia para la compañía de ferrocarril y para el estado, y es idéntica a la planteada en otros casos que están pendientes en el tribunal inferior, mucho más importante entonces es que no sea decidida en un caso donde no existe una disputa." *Little* v. *Bowers,* supra, a la pág. 558.

Y en *California* v. *San Pablo and Tulare Railroad Co.* 149 U. S. 308 (1893) el Tribunal Supremo federal rehusó dictar un fallo sobre los méritos de un litigio que consideró se había tornado académico aun cuando el Procurador General de California solicitó que tal fallo se emitiera por ser el mismo de "suprema importancia para el pueblo del estado de California". (Pág. 313.) Véanse, además, en igual sentido, *Northridge Park County Water District* v. *McDonnell,* supra, pág. 29; *Atlantic Seabord Corp.* v. *Federal Power Commission,* 200 F.2d 796, 797 (C.C.A. 4, 1953); *Campbell Soup Co.* v. *Martin,* 202 F.2d 398, 399 (C.C.A. 3, 1953); *Louisville Transit Co.* v. *Department of Motor Transportation,* 286

S.W.2d 536, 538 (Ky., 1956); *Fugel* v. *Becker*, 2 S.W.2d 743, 746 (Mo., 1928); *Moore* v. *Smith*, 160 P.2d 675, 681 (Ka., 1945); *Ohio Contract Carriers Ass'n* v. *Public Utilities Comm.*, 42 N.E.2d 758, 759 (Ohio, 1942); *Grossman* v. *Statt*, 300 N.Y.S. 152, 154 (1937).

Nuestro dictamen en este recurso, sin embargo, no puede fundarse primordialmente en la autoridad de los precedentes. La consideración decisiva tiene que ser el efecto de nuestro fallo sobre el sistema de gobierno y específicamente sobre la posición que ocupan los organismos judiciales en ese sistema.

Por sabido no debemos olvidar que la revisión judicial es la característica distintiva de nuestro orden político. Circunstancias históricas y el genio creador de John Marshall propiciaron su génesis y desarrollo en la alborada de la nación norteamericana a principios del siglo XIX. Desde entonces e ininterrumpidamente la institución ha estado sujeta a un movido, generalmente dramático, a ratos violento y en una ocasión sangriento debate nacional sobre sus orígenes, características y manifestaciones concretas. No es éste, desde luego, el momento de reseñar ese debate ni es necesario recargar esta opinión con citas alusivas a él. Basta recordar que el centro de la polémica lo constituye la manera en que han de distribuirse los poderes de gobierno entre los representantes del pueblo, quienes reciben mandatos electorales sujetos a revocación periódica, y los jueces, quienes por imperativos conocidos ocupan puestos vitalicios fuera de la acción electoral directa. Cada generación de jueces y funcionarios políticos ha dado una respuesta distinta a varios de los problemas vitales de su época de acuerdo con las circunstancias históricas y la postura que hayan adoptado frente a este interrogante crucial.

En el curso de ese debate el Tribunal Supremo de los Estados Unidos ha establecido valiosísimos criterios de autolimitación para guiar su conducta en situaciones que requieren el ejercicio de su "grave y delicada función" de juzgar la validez constitucional de las medidas legislativas. La ma-

yor parte de ellos y los precedentes aplicables han sido recogidos por el Juez Asociado Sr. Brandeis en su hoy clásica opinión concurrente([41]) en *Ashwander* v. *Tennessee*, 297 U. S. 288, 346 (1935). Son los siguientes:

"1.—La Corte no juzgará la validez constitucional de una ley en un procedimiento amigable, no adversativo, rehusando hacerlo porque 'es legítimo decidir esas cuestiones únicamente como último recurso, y cuando es necesario en la determinación de una real, genuina y seria controversia.'

"2.—La Corte 'no se anticipará a decidir una cuestión de derecho constitucional antes de que sea necesario hacerlo.'

"3.—La Corte 'no formulará una regla de derechos constitucional más amplia que la que requieran los hechos precisos a los cuales ha de aplicarse.'

"4.—La Corte no juzgará una cuestión constitucional aunque haya sido sometida propiamente en los autos, si también se somete un fundamento de otra índole que permita disponer del caso.

"5.—La Corte no juzgará la validez de una ley a petición de uno que no puede probar que su aplicación le causa daños.

"6.—La Corte no juzgará la constitucionalidad de una ley a instancia de uno que se ha valido de sus beneficios.

"7.—'Cuando se cuestiona la validez de una ley del Congreso, y aun cuando se suscite una duda seria sobre su constitucionalidad, es un principio cardinal que esta Corte primero se asegurará de si existe una interpretación razonable de la ley, que le permita soslayar la cuestión constitucional.' "

En los últimos años se ha añadido una restricción más: la Corte no entenderá en una cuestión constitucional si los autos no son adecuados para hacer una determinación de esa índole. *Rescue Army* v. *Municipal Court*, 331 U. S. 549, 575 (1946); *International Brotherhood* v. *Denver Milk Produ-*

---

([41]) "La opinión concurrente en *Ashwander* se considera general y justificadamente como la manifestación cumbre de uno de los temas realmente importantes en la labor judicial de Brandeis: la convicción de que la Corte tiene que hacer todo lo posible para evitar dictámenes precipitados en cuestiones constitucionales, y que, sobre todo, debe decidir esas cuestiones sólo cuando no puede propiamente disponer de otra manera del caso ante ella." Bickel, *The Unpublished Opinions of Mr. Justice Brandeis* (1957) pág. 2.

*cers* 334 U. S. 809 (1948) ; *Parker* v. *Los Angeles*, 338 U. S. 327, 329 (1949).

Como manifestaciones adicionales de ese espíritu de auto-limitación podrían también considerarse la presunción de constitucionalidad que la Corte ha asignado a toda medida legislativa y la norma de no intervenir en controversias "políticas". Cahn (Ed.) *Supreme Court and Supreme Law* (1954) *passim* y especialmente las págs. 109–39; *Luther* v. *Borden*, 7 How. 1 (1849) ; *Pacific Tel. Co.* v. *Oregon*, 223 U. S. 118 (1912) ; *Coleman* v. *Miller*, 307 U. S. 433 (1939) ; *Colegrove* v. *Green*, 323 U. S. 549 (1946).

¿Qué fundamento tienen esas limitaciones? ¿Han sido creadas para satisfacer las exigencias de un preciosismo técnico, o están por el contrario sustentadas por una convicción, a la cual abonan la razón y la experiencia, de cómo debe ejercitarse la gravísima responsabilidad judicial de juzgar la constitucionalidad de las actuaciones legislativas? Es indudable que constituyen un mínimo de condiciones para el ejercicio discreto y tolerable de un poder que de otro modo constituiría una clara amenaza para la calidad democrática del sistema y convertiría a los jueces en guardianes de la comunidad. Factores determinantes de estas normas son la falibilidad del juicio humano, [42] la condición negativa del poder judicial que no posee la autoridad directa que adviene a las otras dos ramas por ser electas por el pueblo, y la convicción de que la Corte perdería su influencia y prestigio y finalmente su autoridad, si, a diario, y fuera de los estrictos límites de un genuino procedimiento judicial, estuviese pasando juicio sobre la validez constitucional de las actuaciones legislativas y ejecutivas.

[42] "Tiene que ser evidente para cualquiera que el poder de decretar la nulidad de una ley es uno que el juez, consciente de la falibilidad del juicio humano, rehusará ejercer en cualquier caso en que pueda declinar la responsabilidad sin violentar su conciencia y con el debido respeto a su deber y a su juramento oficial." Cooley, *Constitutional Limitations*, 8va. ed., pág. 332, cit. en 297 U. S. 345.

"Según los problemas de gobierno se tornan más y no menos complicados; según el impacto dislocante de los avances tecnológicos se torna más poderoso y menos imperceptible, según las fuerzas de la interdependencia económica reclaman más y más determinación e ingeniosidad para mantener una sociedad más simple pero socialmente más satisfactoria, la profunda sabiduría de la autolimitación de la Corte contra intervenciones indebidas o prematuras en lo que al final no son otra cosa que controversias políticas, se torna en la más profunda sabiduría de nuestros tiempos." [43]

Por imperativos del sistema de gobierno tanto las cortes estatales como este Tribunal han adoptado esas normas de autolimitación. *Tesorero* v. *Tribunal*, 71 D.P.R. 298, 303 (1950); *Spanish American Tobacco Co.* v. *Buscaglia*, 71 D.P.R. 991, 993 (1950); *Walker* v. *Tribunal*, 72 D.P.R. 698, 706 (1951); *Pueblo* v. *Marrero*, 79 D.P.R. 649, 652 (1956); *Gobierno de la Capital* v. *Consejo Ejecutivo*, 63 D.P.R. 434, 465 (1944); *Simonet* v. *Sandoval*, 63 D.P.R. 523, 527 (1944); *García González* v. *Tesorero*, 56 D.P.R. 655, 659 (1940); *F. Febles & Cía.* v. *Sancho Bonet*, 50 D.P.R. 778, 780 (1936); *Pueblo* v. *White Star Bus Line, Inc.*, 45 D.P.R. 153, 160 (1933). Pero hay en el caso nuestro un factor adicional. La Sección 4 del Artículo V de nuestra Constitución, al reconocer expresamente la facultad de este Tribunal para decretar la inconstitucionalidad de las leyes, provee como sigue: "Ninguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el Tribunal de acuerdo con esta Constitución o con la Ley." Esa limitación no se encuentra en la Constitución federal ni en las de la gran mayoría de los estados de la Unión. ¿Por qué se incluyó en la nuestra? Afortunadamente, el extenso debate que precedió a su aprobación por la Convención Constituyente nos ofrece la respuesta. Está explicada sucintamente en las siguientes palabras:

[43] Félix Frankfurter, Henry M. Hart, Jr., *The Business of the Supreme Court at October Term, 1934*, 49 Harv. L. Rev. 68, 107 (1935).

"Yo quiero decir que hace tiempo que se viene discutiendo por las personas preocupadas por estos problemas constitucionales si es válido, si es razonable que un grupo de jueces reducido . . . tenga la prerrogativa de ir en contra de la voluntad expresada por el pueblo al ordenar un programa de legislación que es luego puesto en ejecución por los legisladores electos a base de ese programa.

".  .    .    .    .    .    .    .

". . . Sencillamente eso lo que requiere es que una ley, y no empecemos por ley cuando ya está en los estatutos, sino que una disposición que una Cámara de Representantes creyó que era buena y que era constitucional y que un Senado creyó que era buena y que era constitucional y que un ejecutivo creyó que era buena y que era constitucional, antes de convertirse en ley, se requiera que una mayoría absoluta de los jueces para decir que no lo es, tengan que concurrir y que no pueda resultar, resuelto así, contra la propia mayoría de la Cámara, contra la opinión de la mayoría del Senado y contra la opinión del Ejecutivo, resuelto por una minoría del tribunal." [44]

Evidentemente, la Convención tuvo plena conciencia de la "gravedad y delicadeza" de esta función judicial y actuó para limitarla aún más de lo que voluntariamente lo han hecho los tribunales federales.

Es punto menos que aterradora la visión de una sociedad en la cual jueces nombrados por vida tengan la facultad de juzgar la constitucionalidad de los actos oficiales a nombre exclusivamente del "interés público".   Obsérvense las dimensiones de la concesión: Primero, cubriría necesariamente tanto actuaciones legislativas como ejecutivas y tanto cuestiones constitucionales como de interpretación y aplicación de las leyes, pues no habría razón en lógica ni en derecho para permitir el ataque a unas y no a otras.   Segundo, cubriría planteamientos hechos por personas privadas y por organismos públicos, porque tampoco habría razón de clase alguna para reconocer los últimos y no los primeros.   Finalmente,

---

[44] Manifestaciones del delegado Sr. Víctor Gutiérrez Franqui en *Diario de Sesiones, Convención Constituyente de Puerto Rico*, Diciembre 3, 1951, págs. 215, 217.

cubriría prácticamente todas las fases de la vida de la comunidad. En una sociedad como la nuestra, donde por imperativos económicos y sociales la acción del estado penetra en muchos de los aspectos más recónditos de la conducta individual, es difícil encontrar cuestiones que de una u otra manera no estén afectadas por el "interés público".[45]

El caso presente ilustra muy bien los graves peligros que hemos señalado. Por razón del "interés público" se nos pide dictaminemos sobre la constitucionalidad de lo siguiente: (a) la facultad del Estado y de la Autoridad sobre Hogares para expropiar propiedad para usos privados y para ser transferida a personas privadas; (b) la facultad del Estado y del Municipio de Arecibo para otorgar concesiones locales por vía de donación de fondos y de propiedad para ser usados por la Autoridad en la reurbanización de áreas decadentes, y la facultad de la Autoridad para aceptar esas concesiones; (c) la facultad de la Autoridad para tomar dinero a préstamo y emitir bonos y otras garantías para los fines de reurbanización; (d) la facultad de la Autoridad para disponer de los terrenos reurbanizados a un precio menor que el costo de adquisición; (e) las facultades de la Autoridad, la Junta de Planificación y el Municipio de Arecibo para determinar la existencia de un área de arrabal, fijar las condiciones del plan de reurbanización, seleccionar compradores o arrendatarios y fijar el precio de venta o arrendamiento; y (f) las facultades de la Autoridad para realizar operaciones de compraventa de

---

[45] Obsérvese que esta propuesta va mucho más lejos que el sistema de opiniones consultivas (*advisory opinions*) que existe en siete estados de la Unión. En este sistema se designan específicamente los funcionarios u organismos públicos que pueden solicitar la opinión y se especifican las ocasiones en que tal solicitud procede. La opinión se pide antes de que el organismo político realice el acto sobre el cual hay dudas. Aún con estas limitaciones, el sistema ha sido objeto de dura crítica. Véanse en general Pedro Muñoz Amato *et al*, *La Nueva Constitución de Puerto Rico* (1954) págs. 463–464; Hudson, *Advisory Opinions in National and International Law*, 37 Harv. L. Rev. 970 (1924); Frankfurter, *A Note on Advisory Opinions*, 37 Harv. L. Rev. 1005 (1924); Veeder, *Advisory Opinions of the Judges of England*, 13 Harv. L. Rev. 358 (1900).

bienes raíces y para poseer bienes en exceso de quinientos acres. Se desea, además, saber si varias leyes cumplen con el requisito sobre título y asunto especificado en la Sección 17 del Artículo III de la Constitución y si son o no nulas por no haber sido adoptadas nuevamente por la Asamblea Legislativa luego de promulgarse la Constitución de 1952.

En resumen, en este caso y a nombre exclusivamente del "interés público", el Estado y la Autoridad sobre Hogares nos piden hoy dictar un fallo que afectaría la validez del grueso de la legislación vigente en el país, y la legitimidad constitucional de algunos de los más importantes poderes del Estado y de varios de sus organismos principales. Si accediéramos, otros organismos públicos u otras personas o entidades privadas tendrían mañana claro derecho a hacer planteamientos similares ante este Tribunal. Por este medio quedaría definitivamente derrotado el principio básico de la revisión judicial: la constitucionalidad de un acto de gobierno sólo puede juzgarse dentro de los límites de una controversia real entre litigantes opuestos, en la cual sea indispensable dictaminar sobre la validez constitucional del acto para resolver el conflicto surgido entre los litigantes.(46) Si descartáramos ese principio y en su lugar colocáramos el del "interés público", convertiríamos a este Tribunal en una odiosa "tercera cámara" o consejo supremo, facultado para imponer un veto

(46) "[El] poder judicial, como hemos visto, es la facultad de resolver controversias reales surgidas entre litigantes opuestos, debidamente sometidas a tribunales competentes. El poder de declarar inconstitucional una ley surge cuando una ley del Congreso, en la cual uno de los litigantes basa sus derechos, está en conflicto con la ley fundamental. El ejercicio de esta función, la más importante y delicada de esta corte, no le fue otorgada como si fuera un organismo con poderes de revisión sobre las actuaciones del Congreso, sino debido a que los derechos de los litigantes en controversias judiciales obligan a la corte a escoger entre la ley fundamental y una ley que aparentemente fue aprobada dentro de los límites de la autoridad constitucional, pero en verdad más allá de los poderes delegados a la rama legislativa del Gobierno." *Muskrat* v. *United States,* supra, pág. 361. Véase también *Chicago & Grand Trunk Ry. Co.* v. *Wellman,* supra, págs. 344–345.

final sobre las actividades de gobierno en las incontables ocasiones en que el "interés público" estuviese afectado. ([47])

Entendemos perfectamente los legítimos propósitos que impulsan a los demandantes en este caso y nos damos cabal cuenta de la importancia social y económica que tiene el programa de renovación urbana. Pero aún así debemos impedir que la justificada impaciencia del momento nos arrastre hacia una doctrina que sólo puede redundar en un peligrosísimo crecimiento del poder judicial. Aún en la hipótesis de que poseyéramos la sabiduría requerida, por respeto a la soberanía del pueblo tendríamos que negarnos a desempeñar en nuestra sociedad el papel que Platón asignó a los filósofos-reyes en su República. ([48])

Y no debe ser ésta una ocasión más en la cual la defensa de un principio vital cause un desplazamiento de responsabilidades. Es responsabilidad de los funcionarios federales hacer las determinaciones que correspondan sobre la ayuda federal para el programa de renovación urbana de Puerto Rico, tomando en consideración, desde luego, la presunción de validez que acompaña a las determinaciones legislativas, y los precedentes de este Tribunal, ([49]) del Tribunal

---

([47]) Aún aplicando la regla ortodoxa surgen delicadísimos problemas en las relaciones entre jueces y funcionarios políticos que requieren continuos ajustes y comprensión mutua de sus poderes y responsabilidades. Expresiones recientes sobre el problema se encuentran en Learned Hand, *The Bill of Rights* (1958), *passim;* Carl Brent Swisher, *The Supreme Court in Modern Role,* (1958), *passim* y particularmente las págs. 3–65 y 153–91; Edward McWhinney, *Judicial Review in the English-Speaking World* (1956), particularmente las págs. 170–85; Dwight J. Simpson, *Robert N. Jackson and the Doctrine of Judicial Restraint,* 3 U.C.L.A. Rev. 325 (1956) ; y Edmond Cahn (Ed.), *Supreme Court and Supreme Law* (1954) *passim.* Cf. Fisher, *The Supreme Court of India and Judicial Review,* 9 Syracuse L. Rev. 30 (1957).

([48]) *The Republic of Plato,* traducción de Francis McDonald Cornford (1945) *passim* y especialmente las páginas 175–263; Popper, *The Open Society and Its Enemies,* (1950) págs. 119–153.

([49]) *Estado Libre Asociado* v. *Fajardo Sugar Co.,* 79 D.P.R. 321 (1956) —es constitucional la expropiación de una parcela por la Compañía de Fomento para ser vendida o arrendada a una persona privada; *Pueblo* v. *Saldaña,* 69 D.P.R. 711 (1949)—el poder de expropiación de la Autoridad de Tierras no está limitado a entidades que posean más de 500 acres y es

Supremo federal([50]) y de una abrumadora mayoría de los

constitucional la expropiación para el establecimiento de fincas de beneficio proporcional, la distribución y cesión de tierras a "agregados" y la distribución para fincas individuales; *Municipio* v. *Junta de Planificación*, 68 D.P.R. 646 (1948)—es constitucional la expropiación de terrenos para eliminar arrabales; *Autoridad sobre Hogares* v. *Corte*, 68 D.P.R. 54 (1948)—la Autoridad tiene el poder de expropiar propiedad privada, sujeta a las mismas limitaciones constitucionales que el Estado (confirmado en 171 F.2d 563 (1949); *McCormick* v. *Marrero, Juez*, 64 D.P.R. 260 (1944)—es constitucional una expropiación basada en una ley que contiene elementos de beneficio público y para un propósito de carácter público, y la cuestión en cuanto al beneficio que haya de recibir el público debe ser resuelta por la Legislatura y no por los tribunales. Véase también *People of Puerto Rico* v. *Eastern Sugar Associates*, 156 F.2d 316 (1946) *cert. denegado*, 329 U. S. 772 (1946) que sostuvo la constitucionalidad de una expropiación para los fines de la Ley de Tierras y específicamente para vender o arrendar la tierra a personas privadas.

([50]) El principal precedente en la jurisdicción federal es *Berman* v. *Parker*, 348 U. S. 26 (1954) en el cual, además, se recoge la mayor parte de la jurisprudencia anterior. En ese caso se sostuvo la constitucionalidad de la ley de renovación urbana del Distrito de Columbia, prácticamente idéntica a la nuestra, y se establecieron los siguientes principios: 1. la legislatura y no la judicatura es el guardián principal de las necesidades públicas para las cuales se aprueba legislación social, incluyendo leyes de expropiación; 2. a las cortes no les incumbe determinar si un proyecto de viviendas es o no deseable; 3. el concepto de beneficio público incluye tanto valores físicos como valores espirituales, estéticos y económicos; 4. una vez se establezca el beneficio público, es claro el derecho a lograrlo mediante el poder de expropiación forzosa e incumbe al Congreso exclusivamente la determinación de cuáles medios deben utilizarse; 5. el Congreso puede escoger una agencia privada para hacer la reurbanización y puede vender o arrendar la tierra expropiada a personas privadas; 6. se puede expropiar toda el área afectada aunque en ella ubiquen propiedades en buen estado; 7. las normas fijadas en la ley del Distrito de Columbia son adecuadas para sostener la delegación de autoridad a los organismos administrativos; 8. una vez establecido el propósito público, corresponde a la legislatura determinar la cantidad y la clase de terrenos necesarios para llevar a cabo un plan integrado; 9. se protege los derechos de los propietarios cuando ellos reciben la justa compensación que exige la Enmienda Quinta; 10. la autoridad del Congreso sobre el Distrito de Columbia incluye todos los poderes legislativos que un estado puede ejercer sobre sus asuntos. Véanse además, Quintin Johnstone. *The Federal Urban Renewal Programs*, 25 U. of Chi. L. Rev. 301 (1958); Roger P. Marquis, *Constitutional and Statutory Authority to Condemn*, 43 Iowa L. Rev. 170 (1958); *Validity, Construction and Effect of Statutes Providing for Urban Redevelopment by Private Enterprise*, 44 A.L.R.2d 1414 (1955); *The Public Use Limitation on Eminent Domain: An Advance Requiem*, Nota en 58 Yale L. J. 574 (1949); McDougal y Mueller, *Public Purpose in Public Housing: An Anachronism Reburied*, 52 Yale L. J. 42 (1942).

estados.(51)    Es responsabilidad nuestra, y estamos absoluta-
mente convencidos de haberla cumplido, resolver este recurso
de acuerdo con los hechos probados y negarnos a trastocar el
orden constitucional vigente y las debidas relaciones entre los
organismos políticos y los organismos judiciales del estado.

## V

Réstanos dictaminar sobre la conducta del Tribunal
Superior y de los litigantes y abogados en este recurso.

Debemos, en primer término, librar de toda responsabi-
lidad al tribunal de primera instancia.    Éste ejerció sus fun-
ciones de acuerdo con los documentos que se le sometieron y
sin que tuviera, contrario a este Tribunal, motivos para ini-
ciar investigación alguna de las relaciones entre las partes.
De ahora en adelante, desde luego, los tribunales de primera
instancia deberán dar cumplimiento a las normas que hemos
consignado en esta opinión, ejerciendo vigilancia especial en
los recursos interpuestos al amparo de la Regla 7(d).

Tampoco son responsables los funcionarios del Estado
Libre Asociado y del Departamento de Justicia que de una
u otra manera intervinieron en los procedimientos.    La
prueba demuestra que esa intervención fue mayormente
*pro forma*,(52) excepto la del Lic. Aurelio Torres Braschi.

---

(51) Johnstone señala, *op. cit.*, supra, pág. 312, que existe legislación so-
bre renovación urbana en 42 estados, el Distrito de Columbia, Alaska,
Hawaii, Islas Vírgenes y el Estado Libre Asociado de Puerto Rico.    Sola-
mente en Florida, Georgia, Kansas y Carolina del Sur se ha decretado la
inconstitucionalidad de las leyes.    Sin embargo, se ha aprobado nueva
legislación en Georgia y Kansas y en la actualidad hay allí varios proyectos
en funcionamiento.    Las decisiones de Florida y Carolina del Sur tienen
por base un concepto del "uso público" que no prevalece en nuestra
jurisdicción.    Compárense *Edens* v. *City of Columbia*, 91 S. E.2d 280 (S. C.,
1956) y *Adams* v. *Housing Authority*, 60 So.2d 663 (Fla., 1952) con
*Estado Libre Asociado* v. *Fajardo Sugar Co.*, supra, y *McCormick* v. *Ma-
rrero*, supra.    Véanse, además, Joseph Guandolo, *Housing Codes in Urban
Renewal*, 25 Geo. Wash. L. Rev. 1, 50 (1956) y la Nota, ya citada, en
44 A.L.R.2d 1414 (1955).

(52) Los hechos de este caso demuestran la necesidad de que el Departa-
mento de Justicia intervenga activamente y desde sus comienzos en todo
litigio en el cual se impugne la constitucionalidad de una ley, en cumpli-

Éste participó, junto al Lic. Rafael B. Pérez Mercado, en la preparación de un proyecto de conclusiones de hechos y de derecho para el Tribunal Superior y en la preparación del alegato de los demandantes que se sometió a este Tribunal Supremo.   Más adelante, y luego de consultar a la División de Tierras del Departamento, preparó y sometió al Tribunal Superior un escrito especificando no había oposición a la solicitud de retiro de fondos interpuesta por el demandado.   La prueba demuestra que ni el Lic. Torres Braschi ni ningún otro funcionario del Departamento tuvieron conocimiento de las circunstancias peculiares que rodearon este caso como tampoco de las relaciones entre la demandante Autoridad sobre Hogares y el demandado Martín Aguayo y las de este último con el Lic. Jorge V. Toledo.

En situación similar se encuentran los Lics. Octavio Malavé Torres y Pablo Defendini, abogados de la Autoridad.   El primero intervino en este caso con el único propósito de que se le hiciera figurar como abogado de récord de la Autoridad, al cesar el Lic. Pérez Mercado en sus funciones como asesor legal de la demandante.   Además, en una ocasión ayudó al Lic. Pérez Mercado en la búsqueda de jurisprudencia.   El Lic. Defendini fue nombrado Jefe de la División Legal de la Autoridad el 20 de noviembre de 1956.   Para esa fecha el presente recurso ya había sido sometido a este Tribunal. Como abogado de la Autoridad firmó la moción de 8 de octubre de 1957, en la cual se consigna el interés de las partes en que el caso siguiera su curso normal.   Hizo esto luego de una entrevista con los Lics. Rodríguez Ema y Ramírez, de la cual obtuvo la impresión de que nada anormal ocurría en el caso.

Es distinta la situación en que se encuentran los litigantes César Cordero Dávila (en representación de la Autoridad) y Martín Aguayo, y los abogados Rafael Rodríguez Ema, Ra-

miento de la responsabilidad asignádale por la Ley núm. 47 de 25 de abril de 1939 (32 L.P.R.A. sec. 3001) y la Ley núm. 451 de 14 de mayo de 1952 (32 L.P.R.A. sec. 353).

fael B. Pérez Mercado, (53) Jorge V. Toledo y Efraín Ramírez Ramírez. La prueba demuestra claramente que ellos tenían conocimiento de todos o la mayor parte de los hechos que hemos reseñado en la Parte II de esta opinión y los cuales nos convencieron de que este recurso es ficticio. En otras circunstancias, y por tal motivo, hubiésemos ordenado se iniciaran procedimientos de desacato contra los mencionados litigantes y procedimientos disciplinarios contra dichos abogados.

Estamos convencidos, no obstante, que la conducta de los litigantes y abogados obedeció exclusivamente a su deseo de remover las dificultades que una decisión suspendiendo la ayuda federal podría ocasionarle al programa de renovación urbana. No estuvo en su ánimo consideración alguna de lucro o ventaja personal y, por el contrario, actuaron movidos únicamente por el interés público. El caso fue sometido para dejar resueltas las cuestiones que afectaban la constitucionalidad de las leyes de renovación urbana y, como explicara el Lic. Pérez Mercado en su declaración, "sin que ni remotamente pasara por la mente [de las partes y sus abogados] fabricar un caso para desacatar al Tribunal y faltarle el respeto a la Corte." Es ésta, además, la primera vez que este Tribunal interpreta la Regla 7(d) y también la primera vez en que tiene ocasión de determinar el peso que ha de dársele en nuestra jurisdicción al factor "interés público" en el ejercicio del poder judicial de revisar la constitucionalidad de las leyes. Sobre ambos extremos hay un gran número de precedentes, tanto en la jurisdicción federal como en la estatal, los cuales no siguen un patrón uniforme y se prestan, por consiguiente, a interpretaciones contradictorias. *Cf. Acosta* v. *Crespo*, 70 D.P.R. 239, 251 n. 1 (1949); *Díaz* v. *González*, 74 D.P.R. 1004, 1009 (1953); *Great Northern R. Co.* v. *Sunburst Oil and Refining Co.*, 287 U. S. 358, 363 (1932);

---

(53) El Lic. Pérez Mercado renunció su puesto en la Autoridad a raíz de quedar radicado los alegatos del caso ante este Tribunal y desde ese momento cesó su intervención en este recurso.

Patterson, *Jurisprudence, Men and Ideas of the Law* (1953) , págs. 577–579.

Por tales razones nos abstendremos de tomar acción de clase alguna contra los litigantes y sus abogados. Es evidente que en el futuro otras personas no podrán ampararse en esas consideraciones.

*Se revoca la sentencia del Tribunal Superior y se le devuelve el caso con instrucciones de desestimar el recurso por falta de jurisdicción.*