Alfonso de Cumpiano, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
La controversia que se nos plantea en este recurso es si la Ley Orgánica del Colegio de Arquitectos de Puerto *1337 Rico le confiere autoridad a dicha entidad para suspender a uno de sus miembros, sin la intervención de la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores de Puerto Rico y, de conferírsele esa autoridad por disposición-de ley, si ésta es constitucionalmente válida.
I
Los planteamientos de este recurso surgen con motivo de una demanda de interdicto y daños y perjuicios presentada por el Arq. José M. García Gómez contra el Colegio de Arquitectos de Puerto Rico (C.A.P.R.) y otros, debido a que la Junta de Gobierno del C.A.P.R. (la Junta de Gobierno) acordó suspenderle como colegiado por el término de tres años. La Junta de Gobierno basó su decisión en un informe de la Comisión de Etica Profesional del C.A.P.R.
El procedimiento ante la Comisión de Etica Profesional fue iniciado por una querella presentada por el Arq. Otto O. Reyes basada en la alegada intervención del arquitecto García Gómez con un cliente del querellante. La Comisión determinó, previa vista y consideración de prueba testifical y documental, que el arquitecto García Gómez incurrió en violaciones a los Cánones de Etica del C.A.P.R. Recomendó que el C.A.P.R. suspendiera al arquitecto García Gómez como colegiado por . tres años, que el C.A.P.R. recomendara a la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores (la Junta Examinadora) que, previo los trámites legales correspondientes, le suspendiera la certificación como arquitecto por el mismo término y que durante éste, no le concediera cualquier . licencia que solicitare.
En su demanda el arquitecto García Gómez argumentó, en síntesis, que el C.A.P.R. no tiene facultad para impedir el ejercicio de la profesión de arquitecto de una pgrsona autorizada para ello por la Junta Examinadora. Alegó que el C.A.P.R. tendría que acudir ante ;lá Junta Examinadora para que ’ ésta pase juicio, luego de cumplir con el debido proceso de ley. Planteó que de reconocérsele dicha autoridad en ley al C.A.P.R., ésta sería inconstitucional.
En su contestación en torno a la controversia que tratámos, el C.A.P.R. alegó que tenía facultad ! para sancionar a sus colegiados al amparo de la cual suspendió de su colegiación al arquitecto García Gómez y que no tenía que acudir a la Junta Examinadora para descolegiarle.
Sometida la controversia a base de los documentos y escritos, incluyendo la comparecencia del Secretario de Justicia y del Colegio de Ingenieros y Agrimensores como amicus curiae, el tribunal determinó que la ley no le confiere al C.A.P.R. la facultad invocada por dicha entidad de suspender a un miembro con el efecto de impedir el ejercicio de su profesión, sin lá intervención de la Junta ■Examinadora. Ordenó, por tanto, la restitución del arquitecto García Gómez como miembro del C.A.P.R. mientras ostente la autorización de la Junta Examinadora y se mantenga al día en el pago de la cuota.
En su recurso ante nos el C.A.P.R. señala como errores del tribunal el determinar que la ley en cuestión es ambigua e interpretar que se necesita la intervención de la Junta Examinadora para que entre en efecto la suspensión del colegiado y determinar que la delegación de poderes al C.A.P.R. constituye una indebida delegación de poderes públicos a una entidad privada.
Examinados y evaluados los fundamentos de la sentencia, los planteamientos de las partes y las leyes aplicables a la controversia, así como los principios de interpretación de las leyes, determinamos que procede se confirme dicha sentencia.
n
Es bien reconocido el principio que los tribunales no deben pasar juicio sobre planteamientos de inconstitucionalidad de una ley, cuando la controversia bajo su consideración puede ser resuelta a base de otros criterios y fundamentos. Esto es si, como en este caso, existe una interpretación razonable de la ley que permite al tribunal resolver adecuadamente el asunto planteado, no procede entrar en la cuestión constitucional. Caquías v. Asoc. de Residentes, __ D.P.R._(1993); 93 J.T.S. 27, págs. 11068; 11072; Facultad para las Ciencias Sociales Aplicadas, Inc. v. C.E.S.,_D.P.R._(1993); 93 J.T.S. 88, págs. 10778; 10786; E.L.A. v. Aguayo, 80 D.P.R. 552; 596 (1958).
En materia de interpretación de una ley bajo la que se invocan resultados distintos, debemos tener *1338 también presente que si la ley es clara y libre de ambigüedad ésta no debe ser menospreciada bajo el pretexto de cumplir su espíritu, tal cual lo dispone el artículo 14 de nuestro Código Civil, 31 L.P.R.A. sección 14. Ello es así, a menos que la interpretación literal sea contraria a la clara intención legislativa. Atiles v. Com. Industrial, 77 D.P.R. 16 (1954); Caguas Bus Line v. Sierra, 73 D.P.R. 743 (1952).
Ahora bien, reiteradamente se ha establecido que una aplicación literal de la ley, que resulte en consecuencias irrazonables o absurdas, debe evitarse cuando puede interpretarse la ley de manera que sea consistente con el propósito legislativo. Molina v. C.R.U.V., 114 D.P.R. 295; 324 (1983); Esso Standard Oil v. A.P.P.R., 95 D.P.R. 772; 784 (1968).
En otras palabras, cuando sea necesario indagar en la interpretación de una ley, sabido es que su lenguaje debe considerarse bajo el significado que valide su propósito. Corresponde al tribunal armonizar todas las disposiciones de ley aplicables al asunto en controversia de manera que se logre un resultado sensato, lógico y razonable. Para ello, es menester que éste considere el cuadro total de las circunstancias que pretende regular el legislador evitando adjudicar a disposiciones aisladas propósitos que no son cónsonos con los fines trazados por el legislador. Véase E. Bernier y J. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, 2da Ed., Vol. I, Publicaciones J.T.S., San Juan, 1987, págs. 241; 245-247; 267-273 y jurisprudencia allí citada.
En definitiva, si entre dos interpretaciones el tribunal tiene ante sí una que es cónsona con la validez de la ley y también tiene el propósito de armonizar disposiciones que aparentemente están en conflicto, esa interpretación es la procedente. Ibid, pág. 272.
Finalmente, en la consecución de ese objetivo, además de las disposiciones aplicables, los materiales legislativos y otras fuentes, la utilización de leyes con disposiciones análogas, es un medio legítimo para interpretar una ley. Beauchamp v. Holsum Bakers of P.R., 116 D.P.R. 522, 526-527 (1985).
Bajo esa doctrina de deferencia del Poder Judicial al Poder Legislativo, y conforme los principios de interpretación legislativa, el tribunal apelado actuó correctamente al soslayar el planteamiento constitucional e interpretar la ley de manera consistente con la política pública esbozada por el legislador en materia de reglamentación del ejercicio de la profesión de arquitecto. En su análisis, el tribunal se basó en la comparación con disposiciones análogas de leyes habilitadoras de otros colegios y asociaciones profesionales; los posibles cuestionamientos constitucionales, incluyendo la consideración de la doctrina de no delegación de funciones públicas a entidades privadas; la interrelación entre las leyes orgánicas de la Junta Examinadora y del C.A.P.R.
Tengamos presente que la decisión apelada habremos de considerarla bajo la reconocida norma que la revisión de las decisiones se da contra la sentencia, y no de sus fundamentos. Asoc. de Hoteles y de Turismo v. E.L.A.,_D.P.R._(1992); 92 J.T.S. 138, pág. 10030.
Consideremos el asunto planteado conforme los principios antes señalados.
III
La disposición en que se ampara principalmente el C.A.P.R. para argumentar que está facultado para suspender a un colegiado sin intervención de la Junta Examinadora consiste en la sección 2 de la Ley Núm. 96 de 6 de julio de 1978, 20 L.P.R.A. see. 752, que en su parte pertinente expresa:

"El Colegio de Arquitectos tendrá facultad:

(a).

(g) para adoptar o implantar los cánones de ética profesional que regirán la conducta profesional de los arquitectos, los cuales serán aprobados y publicados por la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores de Puerto Rico;

(h) para recibir e investigar las quejas que se formulen respecto a la conducta de sus miembros en *1339 el ejercicio de la profesión, pudiendo remitirlas a la Junta de Gobierno para que actúe. Luego de una vista preliminar, en la que se dará oportunidad al interesado o su representante de ser oído, si se encontrara causa fundada, podrá imponer las sanciones que a su discreción correspondan conforme a su reglamento-, así como instituir el correspondiente procedimiento de cancelación de licencia ante la Junta Examinadora, conforme al medio procesal por ésta establecido y presentará y sostendrá los cargos. Nada de lo dispuesto en este inciso se entenderá en el sentido de limitar o alterar la facultad de Id Junta Examinadora de Ingenieros, Arquitectos y Agrimensores de Puerto Rico para iniciar por su propia cuenta estos procedimientos."
La letra de la referida disposición expresa que el C.A.P.R. "podrá imponer las sanciones que a su discreción correspondan conforme a su reglamento". No dice podrá suspender, sino sancionar ; conforme su reglamento. Por tanto, el C.A.P.R. incorpora un lenguaje donde no existe, cuando nos indica que con toda claridad en dicha disposición se autoriza la suspensión. Si nos atenemos al sentido literal, tenemos que examinar el Reglamento del Colegio de Arquitectos de Puerto Rico aprobado en j 1978, según enmendado, a fin de determinar si en las sanciones, éste contempla la suspensión de un ; arquitecto de la manera que nos propone el C.A.P.R. J
En su Capítulo III, dicho Reglamento contiene las normas referentes al Código de Etica y ; Conducta Profesional. Respecto a acciones disciplinarias, sólo se indica en el artículo 11 que las violaciones de conducta obligatoria están sujetas a "acción disciplinaria" por parte del C.A.P.R. y/o de ; la Junta Examinadora, y en su artículo 18, que los miembros que violen las Reglas de Conducta ; "estarán sujetos a medidas-disciplinarias por el Colegio de Arquitectos de Puerto Rico a través de su Comité de Etica". :
El Reglamento no contiene definición en torno a "acción disciplinaria" o "medidas disciplinarias", ; por lo que no podemos afirmar que está claramente expuesto su alcance, de manera que quede ; comprendida la suspensión de un colegiado, con los efectos propuestos por el C.A.P.R.
Además, la sección 2(h), supra, contempla el instituir el correspondiente procedimiento de cancelación de licencia ante la Junta Examinadora. Ello, claro está, será aplicable cuando se trate de sanciones que acarreen dicha cancelación, por lo que en tales situaciones, resulta necesario instar el procedimiento ante la Junta Examinadora, contrario a lo que sostiene él apelante.
Es razonable la interpretación sugerida por el apelado a los efectos de que si la sección 2(g) requiere la aprobación por la Junta Examinadora de los cánones de ética profesional adoptados por el C.A.P.R., es necesaria su aprobación para implantarlos, sobre todo cuando surja choque con las funciones que por ley viene obligada a ejercer la Junta Examinadora. Así lo dispone el artículo 29 de la ley que crea ésta, Ley Núm. 173 de 12 de agosto de 1988, según enmendada, 20 L.P.R.A. sec. 71 lz (Supl. 1995), al expresar que la Junta deberá incorporar "y hacer cumplir cuando fuere llamado a ello” los Cánones de Etica Profesional adoptados por el C.A.P.R.
Ninguna disposición de la ley o del reglamento en cuestión abonan a la teoría del apelante. Por el contrario, cuando el legislador quiso especificar en la ley del C.A.P.R. cuándo la suspensión de un colegiado tiene el efecto de prohibirle el ejercicio de la profesión, dispuso en su sección 8, 20 L.P.R.A. see. 758, lo siguiente:

"Cualquier miembro que no pague su cuota y que en los demás respectos esté calificado como miembro del Colegio quedará suspendido como tal miembro, pero podrá rehabilitarse mediante el pago de las cuotas adeudadas; Disponiéndose, que el miembro que quede así suspendido, no podrá ejercer la profesión ni disfrutar de los derechos y beneficios correspondientes a los miembros del Colegio durante el período de la suspensión."

Por otro lado, la Ley Núm. 96, supra, requiere en su sección 3, 20-L.P.R.A. see. 753, la colegiación obligatoria para poder ejercer la profesión como arquitecto, "entendiéndose como arquitecto toda persona licenciada como tal por la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores de Puerto Rico."
Resulta en un contrasentido la argumentación del C.A.P.R. en cuanto a que la licencia del *1340 arquitecto suspendido es válida, aun durante la suspensión del Colegio. Por su relevancia sobre lo señalado, transcribimos a continuación su señalamiento a los efectos de que:
"El Colegio acepta como válida la licencia de arquitecto del demandante, aun durante el período en que está suspendido de la colegiación. Las Leyes establecen el requisito de pertenecer al C.A.P.R. para ejercer. Esta consecuencia, aunque reconocida, no es consideración en las determinaciones del Colegio. El C.A.P.R. tiene la obligación de recibir, atender y adjudicar las querellas según lo establecido en la Ley 96, supra y el Reglamento del Colegio." Ap. Conj., pág 91.
La validez real de la licencia, consiste en su utilización para lo que fue expedida, esto es, el ejercicio de la profesión. Nuestro régimen legal vigente no contempla se desligue la colegiación de la licencia para ejercer como arquitecto, tal cual lo sugiere el apelante. Así, pues, no hay duda que estamos frente a un asunto que requiere interpretación en cuanto al alcance de las sanciones o medidas disciplinarias que puede imponer el C.A.P.R., frente a las disposiciones de la Ley Núm. 96 que crea dicha entidad y de la Ley Núm. 173 que crea la Junta Examinadora.
La interrelación de las leyes que crean el C.A.P.R. y la Junta Examinadora queda manifiesta en sus disposiciones, por lo que pasamos a examinar las de la Junta Examinadora que son pertinentes al asunto.
IV
En su potestad de salvaguardar el bienestar público, el Estado reglamenta el ejercicio de las profesiones u oficios a través de la creación de juntas examinadoras. En lo que respecta al ejercicio de la profesión de arquitecto, ésta queda regulada por la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores, bajo la Ley Núm. 173, supra. En su facultad de evaluar la capacidad de los aspirantes al ejercicio de la profesión de arquitecto, de concederles la correspondiente licencia y de suspender, revocar o cancelarla, ejerce una función pública, como instrumento del Estado. Así queda plasmado en su texto, como también en su historial legislativo, donde se señala:

"La Junta tendrá facultad para velar por el fiel cumplimiento de las disposiciones de esta ley y en particular por las cualificaciones académicas que debe tener todo aspirante a ejercer en el Estado Libre Asociado de Puerto Rico, la profesión de Ingeniero, Arquitecto o Agrimensor. Así también velará por la conducta profesional y Etica de todos aquellos autorizados a ejercer tales profesiones en Puerto Rico. De esta manera la Junta se convierte en el instrumento del Estado para garantizar a nuestros ciudadanos que tales profesionales estén moral y profesionalmente capacitados para rendir el servicio de calidad que nuestro pueblo merece, a los fines de fomentar y proteger el bienestar público."

Informe Conjunto del P. del S. 1108, Comisión de Agricultura y Recursos Naturales, Comisión de Gobierno Estatal, Comisión de lo Jurídico, 19 de mayo de 1988, págs. 3 y 4. De conformidad con el artículo 2 de la Ley Núm. 173, 20 L.P.R.A. see. 711 (Supl. 1995), y en armonía con la ley que creó el C.A.P.R., para ejercer como arquitecto la persona ha de reunir los siguientes requisitos:

"(1) estar autorizada por la Junta Examinadora y figurar en su registro oficial y (2) ser miembro activo."

La sanción de suspender una licencia de arquitecto, al igual que la de denegarla, revocarla o cancelarla, está claramente dispuesta en la Ley Núm. 173. Como una de sus causas, se dispone en su artículo 16, 20 L.P.R.A. sec. 21 In (Supl. 1995) el haberse encontrado incurso en violaciones a los Cánones de Etica Profesional del C.A.P.R. No hay duda que tanto la Junta Examinadora como el C.A.P.R. pueden determinar que un colegiado ha violado dichos cánones. Cuando medie tal determinación, entra enjuego la disposición del artículo 16, supra, mediante la cual ello constituiría causa para su suspensión por la Junta Examinadora.
La interrelación entre las leyes de ambas entidades en lo que a suspensión de arquitectos se refiere, queda recogida en el artículo 15, 20 L.P.R.A. sec. 71 lm (Supl. 1995) que en su parte pertinente dispone:
*1341 "Los profesionales a los cuales se les haya inactivado, suspendido o expulsado como miembros de sus respectivos colegios profesionales en virtud de las causas y mediante los procedimientos establecidos por dichos colegios se les suspenderá su certificado o licencia, según sea el caso, mediante la certificación de tal hecho por el oficial autorizado del colegio que corresponda ante la Junta.

Cuando luego de decretada la inactivación, suspensión o cancelación, el correspondiente colegio profesional certifique oficialmente rehabilitación del profesional de que se trate, conforme a las leyes de colegiación aplicables, la Junta le reactivará inmediatamente su licencia o certificado mediante el procedimiento y pago de derecho que se disponga en el reglamento de la Junta. Si la expulsión o suspensión es por razón de falta de pago de la cuota anual, bastará una certificación oficial del colegio correspondiente, lo que constituirá una determinación de hecho suficiente para que la Junta tome la acción que corresponda sin necesidad de seguir el procedimiento de vista que más adelante se establece para los demás casos."

La aludida disposición no establece de manera alguna que el C.A.P.R. puede suspender a un arquitecto sin intervención de la Junta Examinadora. Dispone que al que se hubiere suspendido del Colegio (de Ingenieros o de Arquitectos) "en virtud de las causas y mediante los procedimientos establecidos por dichos colegios", la Junta Examinadora procederá a la suspensión de su licencia, mediante la certificación de tal hecho por el oficial autorizado de la Junta Examinadora. Hemos visto en nuestra exposición anterior que en cuanto al C.A.P.R. ni la ley ni su reglamento disponen causas de suspensión por dicho Colegio, que motiven sin más la suspensión de la licencia, salvo por el no pago de cuota.
Obsérvese en el texto del artículo 15 antes transcrito que sólo se exceptúa de un procedimiento ante la Junta Examinadora cuando se trate de la reinstalación de la licencia de un arquitecto suspendido por falta de pago de la cuota de colegiación. En esa situación dispone la ley que sólo basta una certificación oficial del C.A.P.R. En los otros casos de reinstalación de licencia, no basta la certificación de rehabilitación del Colegio, sino que debe seguirse un procedimiento de vista ante la Junta Examinadora. De esa redacción es razonable concluir que, si se necesita de un procedimiento ante la Junta Examinadora para la reinstalación de la licencia, y no basta un certificado del C.A.P.R., no basta tampoco una notificación o certificación de la suspensión de un colegiado por el C.A.P.R. para que medie la suspensión de su licencia. Salvo por el no pago de cuota, dicha suspensión no puede tener el efecto de provocar la suspensión de la licencia, y por ende del ejercicio de la profesión de arquitecto, sin que se siga un procedimiento ante la Junta Examinadora.
Respecto a lo antes expuesto, considérese que en el Informe de la Comisión de Etica Profesional del C.A.P.R., de 30 de noviembre de 1993, en torno al apelado, las recomendaciones sugieren la acción conjunta de la suspensión de colegiación y de licencia por tres años. Apéndice Conjunto, págs. 53-54. No surge de dicho informe la teoría de los resultados de la suspensión de la colegiación que nos propone el C.A.P.R.
Por otro lado, la comparecencia especial del Secretario de Justicia es un tanto ambigua en su defensa de la facultad del C.A.P.R. para suspender un colegiado y el ejercicio de su profesión sin la intervención de la Junta Examinadora. Al igual que el apelante, sugiere la separación de la colegiación de la otorgación de la licencia para ejercer la profesión de arquitecto, sin orientarnos sobre cómo ello encaja con los requisitos vigentes de ley. Es ilustrativa su conclusión, expresada en estos términos:
"Concluimos, pues, que al Colegio de Arquitectos se le ha conferido poder para sancionar a sus miembros sin la intervención de la Junta Examinadora. También se le ha conferido la facultad de recibir e investigar querellas respecto a la conducta de sus miembros en el ejercicio de su profesión. Puede remitir las mismas a la Junta para que ésta actúe. Entendemos que el poder delegado no es el de adjudicación, sino el de fiscalización." Escrito de comparecencia especial del Secretario de Justicia, 12 de septiembre de 1995, pág. 11.
La dificultad con que nos enfrentamos en la controversia bajo consideración estriba en que ni la Ley Núm. 96, la Ley Núm. 173, el Reglamento del C.A.P.R., el Reglamento Núm. 4378 de la Junta Examinadora de enero de 1991, disponen el curso a seguir por la Junta Examinadora cuando se *1342 certifique por el Colegio, lo que tampoco está expreso, que han mediado violaciones a los Cánones de Etica que ameritan suspensión del colegiado, y consecuentemente, la suspensión de su. licencia. Los historiales legislativos de ambas leyes tampoco arrojan luz al respecto.
En atención a esa laguna, el C.A.P.R. en su argumentación inserta un lenguaje inexistente en la ley. Plantea que la Junta Examinadora viene obligada a seguir el procedimiento que dispone el artículo 18 de su ley, 20 L.P.R.A. sec. 71 lp (Supl. 1995) para la suspensión de la licencia, pero en el ínterin el colegiado no puede ejercer su profesión y que la Junta debe notificar al colegiado que su "licencia ha sido suspendida provisionalmente." Recurso de apelación, pág. 9.
Esa lectura lleva a los resultados absurdos que debemos evitar al interpretar una ley. Presupone que un acto de suspensión del C.A.P.R. lleva consigo una determinación automática de la Junta Examinadora de suspensión provisional, sin que ésta tenga oportunidad alguna dé examinar la situación y las condiciones que ameritan la suspensión de la profesión.
Entendemos que para la debida protección de los intereses públicos , bajo las leyes que interpretamos, el curso de acción armónico debería ser que una vez se haya efectuado un procedimiento por el C.A.P.R. que culmine en una determinación de suspensión del colegiado éste debe certificarlo oficialmente a la Junta Examinadora y ésta tomar la acción de instar de inmediato los procedimientos para determinar si procede la suspensión de la licencia. La Junta Examinadora debe atender con premura una certificación de conducta sancionada, porque su ley le impone la responsabilidad, entre otras, de velar por el cumplimiento de los Cánones Profesionales del C.A.P.R.
En conclusión la interpretación razonable, armoniosa y cónsona con los propósitos legislativos de conceder a la Junta Examinadora la facultad de reglamentar la profesión de arquitecto, lleva a la decisión tomada por el tribunal apelado. Coincidimos con éste en que el C.A.P.R. no puede suspender a un arquitecto sin la intervención de la Junta Examinadora, porque la suspensión como colegiado presupone la inhabilidad para ejercer la profesión de arquitecto. Añadimos, que es necesaria la debida coordinación entre ambas entidades en estos casos, de manera que se hagan viables sus mutuas funciones de velar por el cumplimiento de los Cánones de Etica Profesional del C.A.P.R.
y
El segundo error alegado por el apelante, se refiere a los fundamentos señalados por el tribunal apelado, para sostener que no era factible la lectura del estatuto propuesta por el C.A.P.R., porque podía ser atacado constitucionalmante. Específicamente se refiere el C.A.P.R. a los señalamientos del tribunal respecto a que la decisión de suspender licencias autorizando el ejercicio de una profesión es una propiamente gubernamental y no delegable a una entidad privada, como lo es el C.A.P.R.
El C.A.P.R. cuestiona que el tribunal haya invocado los casos de Schechter Poultry Corp. v. U.S., 295 U.S. 537 (1935) y Carter v. Carter Coal Co., 298 U.S. 238 (1936) para sostener sus expresiones cuestionando la delegación de funciones públicas como las que aquí tratamos en entidades privadas.
Aunque es innecesario entrar en la polémica, debido a que el tribunal no basó su decisión en esas expresiones y hemos determinado que su interpretación de la ley es correcta, debemos señalar que el tribunal no erró al apuntar los posibles cuestionamientos constitucionales con la posición del C.A.P.R.
En los casos de Schechter y Carter citados por el tribunal, el Tribunal Supremo de los Estados Unidos invalidó por ser inconsistente con la Constitución, legislación federal que concedía fuerza de ley a códigos reguladores adoptados por asociaciones privadas. Es cierto que la doctrina establecida en estos casos sobre la delegación a entidades privadas ha sido objeto de severas críticas, pero dos planteamientos al respecto aún tienen vigencia. Así, el Prof. Tribe al criticar la doctrina de los aludidos casos como exagerada y falsa, comenta:

"...but delegations to private groups continue to be disfavored.

The judicial hostility to private lawmaking —even more apparent, perhaps in the context of state delegations— thus represents a persistent theme in American constitutional law." Lawrence H. Tribe, American Constitutional Law, 2nd Ed., 1988, págs. 368-369. 
*1343 El cuestionamiento constitucional señalado por el tribunal sobre la delegación a entidades privadas de funciones gubernamentales en el contexto que consideramos, se ha identificado también, no como problema de delegación indebida, sino como posible privación del debido proceso de ley. A tales fines, se ha indicado que:
"If Congress were to grant a private group the power to control its competitors, in some instances there might be a procedural problem regarding whether the persons regulated were deprived of due process by being subject to the will of entities with interests contrary to theirs. However, this issue does not constitute an excessive delegation problem." John E. Nowak, Ronald E. Rotunda, Constitutional Law, 4th Ed., 1991, págs. 156-157.
Por tanto, no erró el tribunal en puntualizar aquellos planteamientos constitucionales que podría suscitar el reclamo del C.A.P.R. bajo su ley orgánica. Pero téngase claro que su decisión se basó en una interpretación, que hemos determinado razonable, de las disposiciones de Ley, en lugar de adjudicar los posibles planteamientos constitucionales, lo cual claramente indicó era innecesario.
VI
En virtud de todo lo anterior, se confirma la sentencia apelada.
Lo acordó y manda el Tribunal y lo certifica la Secretaria General.
María de la C. González Cruz
Secretaria General
ESCOLIOS 96DTA6
1. Las numerosas leyes "in pari materia" a que hace referencia el tribunal apelado, contienen lenguaje similar al de la ley del C.A.P.R., por lo que no procede acudir a la que tiene lenguaje diferente, esto es, la ley orgánica del Colegio de Ingenieros y Agrimensores. 20 L.P.R.A., sec. 731(h).
2. Tribe cita en su tratado como ensayo clásico sobre el tema a: Jaffe, "Law Making by Private Groups", 51 Harv. L. Rev. 201 (1937), así como fuente general a Liebman, "Delegation to Private Parties in American Constitutional Law", 50 Indiana L. J. 550 (1975).